[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 5, 2009
THOMAS K. KAHN
CLERK

_____

Nos. 06-15561 & 06-15562

_____

D. C. Docket No. 05-80980-CV-KLR

UNITED TECHNOLOGIES CORPORATION,

Plaintiff-Appellant,

versus

RUSSELL MAZER,

Defendant,

AIRCRAFT POWER MAINTENANCE,
WEST-HEM AIRCRAFT SUPPLIES, INC.,

Defendants-Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(February 5, 2009)**

Before TJOFLAT, MARCUS, and WILSON, Circuit Judges.

TJOFLAT, Circuit Judge:

This case stems from the theft and sale of blueprints relating to an aircraft engine manufactured by the Pratt & Whitney division ("Pratt") of United Technologies Corporation ("UTC"). UTC claimed that West-Hem Aircraft Supplies, Inc. ("West-Hem") and Aircraft Power Maintenance ("APM") are legally responsible for the theft and sale, and it sued them in the United States District Court for the Southern District of Florida. The district court, in separate orders, granted West-Hem's motion to dismiss UTC's complaint for failure to state a claim for relief[1] and APM's motion to dismiss for lack of personal jurisdiction,[2] and it entered final judgments pursuant to those orders under Rule 54(b) of the Federal Rules of Civil Procedure. UTC now appeals. We reverse the judgment for West-Hem, concluding that the complaint states a claim for relief. We affirm the judgment for APM, however, because the district court correctly found that the record provided an insufficient basis for exercising personal jurisdiction over APM.

---

[1] See Fed. R. Civ. P. 12(b)(6).

[2] See Fed. R. Civ. P. 12(b)(2).

# I.

## A.[3]

Pratt is a wholly-owned division of UTC, a Delaware corporation headquartered in Hartford, Connecticut, and is engaged in the business of manufacturing, repairing, maintaining, and providing related support and services for turbine engines. West-Hem is a Florida corporation, located in Riviera Beach, Florida, in the business of buying and selling aircraft parts and related support materials. APM is a Belgian company, located in Wevelgem, Belgium, engaged in the business of repairing and maintaining aircraft engines. Russell Mazer, a co-defendant in this case, is president and part owner of West-Hem and a director and 40% owner of APM. West-Hem had long been a customer of Pratt, and APM had been a customer of both Pratt and West-Hem for years.

As part of its business, APM repaired and maintained Pratt engines, including engine model PWAJT8D ("JT8D"). In order to work on a JT8D, as with any Pratt engine, APM would need to purchase from Pratt either specially-made

---

[3] The facts stated in subpart I.A are those alleged in UTC's complaint, as amended (referred to in this opinion as the "complaint"), which we have read in the light most favorable to UTC, and accepted as true. Bridge v. Phoenix Bond & Indem. Co., -- U.S. --, 128 S. Ct. 2131, 2135 n.1, 170 L. Ed. 2d 1012 (2008) (citation omitted). We read the complaint in this way to determine whether, contrary to the district court's ruling, UTC has stated a claim for relief. In determining whether the district court correctly found an insufficient basis for exercising personal jurisdiction over APM, we consider the allegations of the complaint and the affidavit APM presented in support of its motion to dismiss.

precision tools or blueprints and licenses required to make such precision tooling for itself. For this reason, APM had an interest in acquiring a set of Pratt's blueprints for the JT8D tooling, and West-Hem wanted to fulfill that need by acquiring a set of the blueprints to sell to APM. To this end, West-Hem's Mazer had tried to locate and purchase a set of the blueprints from numerous sources, who quoted prices as high as $100,000. The reasonable commercial value of the blueprints, which Pratt deemed to be protected and proprietary, was approximately $250,000.

In November 2003, Mazer met with Pratt employees in Connecticut about West-Hem business unrelated to this case. Among the Pratt personnel with whom Mazer met while in Connecticut was Anthony DiLorenzo, a temporary contract worker. Mazer mentioned to DiLorenzo that he was interested in acquiring a set of the JT8D tooling blueprints. Although DiLorenzo's employment contract with Pratt prohibited him from accessing Pratt's proprietary or other protected information without authorization from a responsible authority, he apparently suggested to Mazer that he could provide the blueprints.[4]

---

[4] Although the complaint does not explicitly allege that DiLorenzo told Mazer that he would have to steal the blueprints to do so or that Mazer asked DiLorenzo to steal them, we infer from what is alleged that Mazer knew that any blueprints he obtained from DiLorenzo would be stolen.

Between January and March 2004, APM's managing director, Wilhelm Loetschert, was visiting Florida from Belgium and staying at Mazer's home in order to attend helicopter pilot training. At some point during this period, Mazer and Loetschert discussed West-Hem's potential acquisition of the Pratt blueprints from DiLorenzo, including the price that West-Hem would pay for the blueprints.[5]

At some point in February or March 2004, DiLorenzo either accessed or caused someone else to access a protected Pratt computer and, without authorization, obtained a printed copy of the JT8D tooling blueprints. Thereafter, in March or April 2004, West-Hem and Mazer purchased the blueprints from DiLorenzo for approximately $5,000.[6] Mazer provided DiLorenzo with West-Hem's Federal Express account information to use in sending the blueprints to West-Hem in Florida, received the blueprints at West-Hem's office, and instructed West-Hem employees to send DiLorenzo payment for the blueprints using West-Hem's Federal Express account. APM's Loetschert provided a portion

---

[5] The complaint does not allege, however, exactly when Mazer and Loetschert agreed upon a price or when, if ever, Loetschert learned that the sale would be illicit.

[6] The complaint does not allege exactly when Mazer and DiLorenzo (1) agreed that DiLorenzo would steal the blueprints (if they ever made such an express agreement); (2) confirmed that Mazer and/or West-Hem would purchase them; or (3) settled on the price DiLorenzo would receive. The complaint does allege, however, that Loetschert objected to DiLorenzo's initial asking price as too high and later decided with Mazer on the amount that West-Hem would pay.

of the cash used to purchase the blueprints while he was staying in Florida with Mazer.[7]

Following Mazer and West-Hem's receipt of the blueprints, Mazer had West-Hem employees make copies of the blueprints using West-Hem equipment and store the original blueprints at West-Hem's Florida office. In March or April 2004, Mazer also had West-Hem employees ship a copy of the blueprints, using West-Hem's Federal Express account, to APM's office in Belgium. Subsequently, West-Hem issued one or more invoices to APM charging approximately $25,000 for the blueprints, and APM paid.

On August 27, 2004, Mazer pled guilty in Florida state court to a criminal charge of dealing in stolen property, in violation of Fla. Stat. § 812.019, in connection with his purchase and sale of the stolen Pratt blueprints. Additionally, in or around February 2005, in connection with the theft of the Pratt blueprints, DiLorenzo pled guilty in federal court in Connecticut to a charge of accessing a protected computer without authorization to further an intended fraud, in violation of 18 U.S.C. § 1030(a)(4).

_____

[7] The complaint does not allege whether the balance of the purchase money came from West-Hem's corporate funds, Mazer's personal funds, some combination of the two, or some other source.

B.

UTC brought this lawsuit against Mazer, West-Hem, and APM on November 3, 2005.[8] Its complaint, as amended, contains eleven counts,[9] alleging torts under Florida common and statutory law. All three defendants were charged with civil theft, pursuant to Fla. Stat. §§ 812.014 and 772.11, and conversion; West-Hem and APM were charged with unjust enrichment; West-Hem and Mazer were charged with dealing in stolen property, pursuant to Fla. Stat. §§ 812.019 and 772.1; and all three defendants were charged with conspiring to commit the above torts.

West-Hem moved the court to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief. APM moved the court to dismiss it from the case under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. APM accompanied its motion with the affidavit of its managing director, Wilhelm Loetschert, in which Loetschert admitted his

---

[8] The district court dismissed UTC's initial complaint without prejudice, with leave to amend, for failure to state a claim against West-Hem and for lack of personal jurisdiction over APM. This opinion addresses the claims set out in UTC's complaint, as amended.

[9] Counts I, IV, VII, X, and XI asserted respectively against West-Hem claims for civil theft, conversion, unjust enrichment, dealing in stolen property, and conspiracy (with Mazer and APM to commit the torts presented by the other counts). Counts II, V, IX, and XI asserted respectively against Mazer claims for civil theft, conversion, dealing in stolen property, and conspiracy. Counts III, VI, VIII, and XI asserted respectively against APM claims for civil theft, conversion, unjust enrichment, and conspiracy.

limited personal presence in Florida, unrelated to APM business, in December 2003 and from January 31, 2004 to March 24, 2004; described APM's lack of general contacts with the state of Florida; and specifically denied several newly-added factual allegations relating to him and APM appearing in UTC's complaint. In response to the Loetschert affidavit, UTC attempted to establish personal jurisdiction over APM by tendering a summary of an August 24, 2004 interview of Russell Mazer, prepared by Special Agent Andrew Dunphy of the Office of the Inspector General of the U.S. Department of Defense (the "Dunphy Report"), in which Mazer purportedly provided information corroborating UTC's allegations concerning Loetschert and APM's knowledge and conduct – in Florida – regarding the purchase of the stolen blueprints.[10]

The district court granted both motions. Addressing West-Hem's motion, the court found impossible UTC's allegation that Mazer committed his wrongful

---

[10] It appears that Special Agent Dunphy, who is based in Connecticut, conducted his interview of Mazer as part of the federal government's investigation into DiLorenzo's criminal conduct with respect to the Pratt blueprints. Mazer was represented by counsel and spoke to Dunphy under the representation of the U.S. Attorney for the District of Connecticut that nothing he said would be used against him "in the Government's direct case in the event a federal criminal case is brought against [him] in the District of Connecticut." Assistant U.S. Attorney Maria Kahn, also based in Connecticut, attended part of the interview by telephone. Also joining Special Agent Dunphy at the Mazer interview, which took place at the Office of the Florida Department of Law Enforcement in West Palm Beach, Florida, was Assistant Statewide Prosecutor William Shepherd of the Office of the Florida Attorney General, who presumably attended in connection with a criminal case the State of Florida was bringing against Mazer.

acts both personally and in his capacity as president of West-Hem: "Simply put, if Mazer personally committed the crimes, he could not also have committed them as a representative of West-Hem." Furthermore, the district court found that the complaint failed to establish that Mazer's conduct was within the scope of his West-Hem employment because "there is no allegation that West-Hem makes the buying or selling of blueprints part of its business." Instead, the court continued, Mazer's conduct could only be within the scope of his employment "if West-Hem was in the business of 'fencing' stolen property."

Turning to APM's motion, the district court concluded that it lacked general jurisdiction over APM due to the absence of general, systematic business contacts by APM with Florida. The court further found that the Loetschert affidavit had specifically rebutted each of UTC's allegations of APM's contacts with Florida relating to the causes of action stated in the complaint. The court rejected UTC's argument that Mazer's statements in the Dunphy Report established jurisdiction on the ground that Mazer's statements constituted hearsay within hearsay and thus were inadmissible and incompetent. As a further basis for granting APM's motion, the court pointed to cases interpreting the "[c]ommitting a tortious act within this state" provision of the Florida long-arm statute, Fla. Stat. § 48.193(1)(b), as requiring a claim of injury in Florida, something the complaint

did not allege. Finally, the court found UTC's conspiracy claim against APM insufficient to support personal jurisdiction due to the absence of a viable allegation that APM, West-Hem, and Mazer had conspired to commit a tort in Florida.

Upon UTC's motion, the district court granted separate and final judgments, pursuant to Rule 54(b), in favor of West-Hem and APM. This appeal followed.

## II.

We review <u>de novo</u> the dismissal of the claims against West-Hem under Rule 12(b)(6), accepting the allegations in the amended complaint as true and construing them in the light most favorable to UTC. <u>Mills v. Foremost Ins. Co.</u>, 511 F.3d 1300, 1303 (11th Cir. 2008). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Id.</u> (quoting <u>Bell Atl. Corp. v. Twombly</u>, -- U.S. --, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007) (citations omitted)). "Furthermore, the plaintiff's factual allegations, when assumed to be true, 'must be enough to raise a right to relief above the speculative level.'" <u>Id.</u> (same).

UTC's complaint asserted, in Counts I, IV, VII, X, and XI, respectively, five claims against West-Hem: civil theft, conversion, unjust enrichment, dealing in stolen property, and conspiracy. We examine in turn the elements necessary to state each claim.

First, to state a claim for civil theft under Florida law, UTC must allege an injury resulting from a violation by West-Hem of the criminal theft statute, Fla. Stat. § 812.014.[11] To do this, UTC must allege that West-Hem (1) knowingly (2) obtained or used, or endeavored to obtain or use, UTC's property with (3) "felonious intent" (4) either temporarily or permanently to (a) deprive UTC of its right to or a benefit from the property or (b) appropriate the property to West-Hem's own use or to the use of any person not entitled to the property. Fla. Stat. §§ 772.11 (providing civil remedy for theft or exploitation), 812.014(1) (criminal theft statute); see Almeida v. Amazon.com, Inc., 456 F.3d 1316, 1326-27 (11th Cir. 2006); Gersh v. Cofman, 769 So. 2d 407, 409 (Fla. 4th DCA 2000) ("In order

---

[11] The Florida theft statute provides:
(1) A person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or use, the property of another with intent to, either temporarily or permanently:
      (a) Deprive the other person of a right to the property or a benefit from the property.
      (b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property.
Fla. Stat. § 812.014(1).

11

to establish an action for civil theft, the claimant must prove the statutory elements of theft, as well as criminal intent.").

Conversion is an "act of dominion wrongfully asserted over another's property inconsistent with his ownership therein." Thomas v. Hertz Corp., 890 So. 2d 448, 449 (Fla. 3d DCA 2004) (quotation omitted). The tort "may occur where a person wrongfully refuses to relinquish property to which another has the right of possession," and it "may be established despite evidence that the defendant took or retained property based upon the mistaken belief that he had a right to possession, since malice is not an essential element of the action." Seymour v. Adams, 638 So. 2d 1044, 1047 (Fla. 5th DCA 1994) (citations omitted).

"The essential elements of a claim for unjust enrichment are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." Rollins, Inc. v. Butland, 951 So. 2d 860, 876 (Fla. 2d DCA 2006).

Like civil theft, a civil claim for dealing in stolen property requires an injury resulting from a violation of the criminal statute prohibiting dealing in stolen

property, Fla. Stat. § 812.019.[12]  Accordingly, to state a claim for dealing in stolen property, UTC must allege that West-Hem, with felonious intent, (1) trafficked in, or endeavored to traffic in, property that it knew or should have known was stolen, or (2) initiated, organized, planned, financed, directed, managed, or supervised the theft of property and trafficked in such stolen property.  Fla. Stat. §§ 772.11 (providing civil remedy for theft or exploitation), 812.019 (criminal dealing in stolen property statute); cf. In re Standard Jury Instructions in Criminal Cases – Report No. 2006-2, 962 So. 2d 310, 327 (Fla. 2007).

Finally, to state a claim for civil conspiracy, UTC must allege:  "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy."  Charles v. Fla. Foreclosure Placement Ctr., LLC, 988 So. 2d 1157, 1159-60 (Fla. 3d DCA 2008).

---

[12]  The Florida dealing in stolen property statute provides:
(1) Any person who traffics in, or endeavors to traffic in, property that he or she knows or should know was stolen shall be guilty of a felony of the second degree, punishable as provided in ss. 775.082, 775.083, and 775.084.
(2) Any person who initiates, organizes, plans, finances, directs, manages, or supervises the theft of property and traffics in such stolen property shall be guilty of a felony of the first degree, punishable as provided in ss. 775.082, 775.083, and 775.084.
Fla. Stat. § 812.019.

13

Counts I, IV, VII, X, and XI appear to recite all of the required elements of these five claims against West-Hem. The question, however, is whether those counts also allege facts sufficient to maintain the claims against West-Hem, as opposed to only its president Mazer individually.

It is axiomatic that a corporation like West-Hem cannot act other than through its officers, employees, and agents. Palazzo v. Gulf Oil Corp., 764 F.2d 1381, 1385 (11th Cir. 1985) ("The rule is well established that a corporation is an artificial entity that can act only through agents . . . ."). But this non-controversial truth does not necessarily impute to the corporation any and all conduct by one who at times also acts on a corporation's behalf. Indeed, the district court's overriding objections to UTC's complaint addressed the extent to which the complaint unambiguously established (1) that Mazer acted in the scope of his employment, in pursuit of West-Hem's business interests, when he purchased and re-sold the stolen Pratt blueprints; and (2) that Mazer acted for the benefit of West-Hem, as opposed to himself. The district court concluded on both scores that UTC's pleading failed to tie Mazer's actions to West-Hem in a manner sufficient to state a claim for corporate liability. At this threshold pleading stage, we disagree.

"Under the doctrine of respondeat superior, an employer cannot be held

14

liable for the tortious or criminal acts of an employee, unless the acts were committed during the course of the employment and to further a purpose or interest, however excessive or misguided, of the employer." Iglesia Cristiana La Casa Del Senor, Inc. v. L.M., 783 So. 2d 353, 356 (Fla. 3d DCA 2001).  Under Florida law, an action falls within the scope of employment if the conduct:  (1) is of the kind the employee was employed to perform; (2) occurred within the time and space limits of the employee's employment; and (3) was activated at least in part by a purpose to serve the employment.  Spencer v. Assurance Co. of Am., 39 F.3d 1146, 1150 (11th Cir. 1994); Iglesia Cristiana, 783 So. 2d at 357.  The question is whether, under this legal standard and in view of the facts available to UTC at the time of pleading, UTC adequately alleged that Mazer was acting within the scope of his West-Hem employment.

In its recitation of the facts, UTC had virtually no choice but to link the allegations against West-Hem closely to those against the company's president, Mazer.  For example, its complaint stated that "Mazer was acting as the President of West Hem and within the scope of his employment when he committed the tortious and criminal acts described in this Amended Complaint" and that "[a]t all relevant times, Mazer was President and a substantial owner of West Hem and was entirely responsible for the daily operations of West Hem."  Am. Compl. at ¶¶ 12,

15

14. Moreover, UTC alleged that Mazer – all "as President of West Hem" – traveled to Connecticut in November 2003 for his initial meeting with DiLorenzo; gave DiLorenzo West-Hem's Federal Express account information to use in shipping the blueprints to West-Hem; instructed West-Hem employees to send DiLorenzo payment, make copies of the blueprints, ship a copy of the blueprints to APM, and generate invoices from West-Hem to APM for the blueprints; and stored the original blueprints. Id. at ¶¶ 15, 27, 29-31, 35-36.[13]

West-Hem argues that UTC failed to plead the three elements required for a finding that Mazer's conduct was within the scope of his employment and instead relied on conclusory statements of law or mixed law and fact. Nevertheless, although UTC, in its complaint, did not expressly allege these three elements, we conclude that the complaint's allegations regarding Mazer's conduct "within the scope of his employment" either incorporate these elements or generate an inference of these elements sufficient for notice pleading and to withstand a Rule 12(b)(6) motion to dismiss.

UTC has pled facts that, when read together, at least arguably allege (1) that Mazer's conduct in purchasing the blueprints for, and selling them to, one of

---

[13] These factual allegations were incorporated into each of the counts brought against West-Hem. Am. Compl. at ¶¶ 69, 86, 98, 124, 132.

16

West-Hem's aviation customers (whether or not the blueprints were stolen) could reasonably have been the kind of task for which he was employed; (2) that Mazer acted within the time and space constraints of his employment, i.e., he acted while on duty at West-Hem; and (3) that Mazer could reasonably have been acting to serve and benefit West-Hem's business. The allegations that Mazer was West-Hem's top officer, with broad responsibilities for the company's operations, and that he utilized West-Hem resources and employees in obtaining, copying, storing, and shipping the blueprints further bolster UTC's good faith basis for alleging that these actions were taken within the scope of Mazer's employment at West-Hem. Discovery to be taken by UTC may well reveal additional evidence to be used in carrying its burden, on summary judgment or at trial, of establishing that Mazer acted within the scope of employment.

Should West-Hem come forward with evidence that Mazer was in some way not acting within the scope of his West-Hem employment, the jury will have the chance to resolve this question of fact. See Canaveras v. Continental Group, Ltd., 896 So. 2d 855, 858 (Fla. 3d DCA 2005) ("Where . . . there is conflicting evidence on the issue of whether an employee is acting within the scope of employment, a jury question is presented."). Indeed, it may well be the case that Mazer was acting outside the scope of his employment. Perhaps his job description, or even a

17

resolution of the West-Hem Board of Directors, expressly prohibited dealing in blueprints or proscribed any illegal conduct. Alternatively, perhaps UTC will be unable to muster evidence sufficient to establish that Mazer's conduct was within his scope of employment. However, at the pleading stage, UTC could not possibly have had access to the inside West-Hem information necessary to prove conclusively – or even plead with greater specificity – the factual basis for holding West-Hem liable for Mazer's conduct. That is why we have discovery. At the pleading stage, we assess only whether UTC's allegations are "enough to raise a right to relief above the speculative level." Mills, 511 F.3d at 1303 (quoting Twombly, 550 U.S. at 555, 127 S. Ct. at 1964-65). Giving UTC, which is at a clear informational disadvantage, some benefit of the doubt to go along with the specific facts it has pled, its allegation that Mazer was acting on behalf of West-Hem reaches at least above the speculative level.

The district court held otherwise in part because it found "no allegation that West-Hem makes the buying or selling of blueprints part of its business," and concluded that Mazer's conduct could only be within the scope of his employment "if West-Hem was in the business of 'fencing' stolen property." This reading of UTC's complaint is far too cramped. UTC clearly alleged that West-Hem "is in the business of buying and selling aircraft parts and related support materials."

18

Am. Compl. at ¶ 6 (emphasis added). Blueprints for tooling used in servicing

aircraft engines reasonably fall within the ambit of "related support materials."

Should West-Hem later come forward with evidence that, within the industry,

blueprints are considered an entirely separate line of business, that would create a

question of fact for the jury, not a basis for dismissal for failure to state a claim.

See Canaveras, 896 So. 2d at 858. Nor was UTC required to go so far as to allege

that West-Hem was established as an explicitly criminal enterprise, or that Mazer's

job description included criminal functions, in order to state a claim for corporate

liability for an employee's discharge of his duties in an illegal manner. If aviation

blueprints could reasonably fall within West-Hem's stock in trade, and if part of

Mazer's employment duties was to buy and sell the goods in which West-Hem

traded, then West-Hem could reasonably be answerable for its employee's illegal

or tortious conduct in carrying out those tasks.

The district court was also disturbed by UTC's allegation that Mazer acted

both personally and on behalf of West-Hem, which the court found to be

irreconcilably inconsistent. It is true that the complaint contains a degree of

ambiguity regarding whether Mazer acted for himself, for West-Hem, or for both,

as well as whether it was Mazer or West-Hem that provided the funds to acquire

the blueprints from DiLorenzo and that received the proceeds from APM. At the

19

initial pleading stage, however, we find UTC's allegations sufficient to state the claims asserted against West-Hem.

First, we are not troubled by what the district court saw as inconsistent allegations. Rule 8(d) of the Federal Rules of Civil Procedure expressly permits the pleading of both alternative and inconsistent claims.[14] Thus, UTC's complaint is not subject to dismissal simply because it alleges that both Mazer, individually, and West-Hem committed the tortious conduct, even if it would be impossible for both to be simultaneously liable (which question of impossibility we need not, and do not, resolve).

Furthermore, it is hard to imagine how UTC could have pled its case with greater specificity or accuracy at this stage. The intricacies of the scope of Mazer's employment authority, as well as the details regarding exactly who provided the funds for DiLorenzo and received the benefit of the payments from

---

[14] Rule 8, in relevant part, provides:
(d) Pleading to Be Concise and Direct; Alternative Statements; Inconsistency.
. . .
>     (2) Alternative Statements of a Claim or Defense. A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.
>     (3) Inconsistent Claims or Defenses. A party may state as many separate claims or defenses as it has, regardless of consistency.
Fed. R. Civ. P. 8(d).

APM, are peculiarly within the knowledge of Mazer and West-Hem. Although UTC has pled a reasonable good faith basis for its claims against both Mazer and West-Hem, it has not yet been in a position to know all of the particulars. Should discovery reveal that Mazer was undisputably outside the scope of his employment or that he, not West-Hem, was the sole beneficiary of the sale of the blueprints, then West-Hem may be entitled to summary judgment or judgment as a matter of law. At the initial pleading stage, however, UTC's allegations were sufficient to state a claim.

For the foregoing reasons, we conclude that the allegations of Counts I, IV, VII, X, and XI, when read in the light most favorable to UTC, are sufficient to state a non-speculative claim for relief against West-Hem. We reverse the district court's holding to the contrary.

## III.

We review <u>de novo</u> the district court's dismissal of the claims against APM for lack of personal jurisdiction. <u>Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.</u> 288 F.3d 1264, 1268 (11th Cir. 2002). A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction. <u>Posner v. Essex Ins. Co., Ltd.</u>, 178 F.3d 1209, 1214 (11th Cir. 1999) (per curiam); see

Polskie Linie Oceaniczne v. Seasafe Transport A/S, 795 F.2d 968, 972 (11th Cir. 1986) (describing procedure for plaintiff to establish personal jurisdiction under Florida's long-arm statute).  Where, as here, the defendant challenges jurisdiction by submitting affidavit evidence in support of its position, "the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction."  Meier, 288 F.3d at 1269; Posner, 178 F.3d at 1214; see Polskie Linie Oceaniczne, 795 F.2d at 972 (noting that, if the defendant makes a showing of the inapplicability of the long-arm statute, "the plaintiff is required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint").

A federal court sitting in diversity undertakes a two-step inquiry in determining whether personal jurisdiction exists:  the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[15] Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A., 421 F.3d 1162, 1166 (11th Cir. 2005); see also Venetian Salami Co. v. Parthenais, 554 So. 2d 499, 502

---

[15]  Because we conclude, as discussed below, that UTC has failed to establish through its allegations or competent evidence that APM is subject to personal jurisdiction under Florida's long-arm statute, we do not reach the due process inquiry.

22

(Fla. 1989). "The reach of the [Florida long-arm] statute is a question of Florida law. [F]ederal courts are required to construe [such law] as would the Florida Supreme Court. Absent some indication that the Florida Supreme Court would hold otherwise, [federal courts] are bound to adhere to decisions of [Florida's] intermediate courts." Meier, 288 F.3d at 1271 (internal quotation marks and citations omitted).

UTC asserts that APM is subject to jurisdiction under subsection (1)(b) of the Florida long-arm statute, which provides:

> (1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:
> . . .
>     (b) Committing a tortious act within this state.

Fla. Stat. § 48.193(1)(b). UTC's complaint asserted four claims against APM, in Counts III, VI, VIII, and XI: civil theft, conversion, unjust enrichment, and conspiracy. Thus, UTC had to establish by the allegations in its complaint and, if challenged by APM as it was, by its evidence that APM, with respect to at least one of these counts, engaged in tortious conduct in Florida relating to the theft and

23

sale of the Pratt blueprints.[16]

UTC essentially makes the following explicit allegations regarding APM's conduct in Florida relating to the Pratt blueprints:

[16] We have little trouble dismissing any contention that APM is subject to general jurisdiction under Florida's long-arm statute, which provides for the exercise of personal jurisdiction over "[a] defendant who is engaged in substantial and not isolated activity within this state . . . whether or not the claim arises from that activity." Fla. Stat. § 48.193(2). Florida courts have held this "substantial and not isolated activity" requirement to mean, and subsume, the "continuous and systematic general business contacts" standard sufficient to satisfy the due process requirement of minimum contacts for general jurisdiction, as set forth by the Supreme Court in Helicopteros Nacionales de Colombia S.A. v. Hall, 466 U.S. 408, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984), such that "if the defendant's activities meet the requirements of section 48.193(2), minimum contacts is also satisfied." Woods v. Nova Companies Belize Ltd., 739 So. 2d 617, 620 (Fla. 4th DCA 1999). UTC's complaint does allege that "Defendant APM is a foreign corporation that regularly conducts business in this district; whose Managing Director, Wilhelm Loetschert, was domiciled in this district for an extended period of time; that conducted business on behalf of APM from this district . . . ." Am. Compl. at ¶ 9. However, in his affidavit, Loetschert specifically denied, in detail, that APM conducted business in Florida, see Loetschert Affidavit at ¶¶ 6-11, and UTC has provided no evidence to the contrary. Moreover, the factual allegations regarding Loetschert's temporary, less-than-two-month stay in Florida, which appears to have been personal in nature, unrelated to his work for APM, and, in any event, insufficient to support a claim that he was "domiciled" in the state, as well as Loetschert's purported business conducted in Florida on behalf of APM, fall far short of amounting to either "substantial and not isolated activity" or "continuous and systematic general business contacts" by APM within Florida. See Slaihem v. Sea Tow Bahamas Ltd., 148 F. Supp. 2d 1343, 1350-51 (S.D. Fla. 2001) ("To establish that a defendant is engaged in substantial activity within the state, the activity must be more than 'incidental, almost entirely personal contacts with the state . . . .'" (citation omitted)); Snyder v. McLeod, 971 So. 2d 166, 169 (Fla. 5th DCA 2007) ("A legal residence or 'domicile' is the place where a person has fixed an abode with the present intention of making it his or her permanent home." (citation omitted)). Nor is the complaint's allegation that "APM and West Hem have conducted other business involving the sale and purchase of aircraft parts from West Hem in Florida," without any allegation or showing of the magnitude or frequency of such business, sufficient to constitute "substantial and not isolated activity" by APM in Florida. Am. Compl. at ¶ 42. UTC suggests that Mazer, in his answer to the complaint, admitted that APM does business in the Southern District of Florida. Appellant's Br. at 20. Without deciding the thorny question of whether an admission by Mazer could even bind APM in this context, we note that Mazer's response to paragraph 9 of the complaint in fact expressly carves APM out of his admission: "Admitted except I am without knowledge of what acts APM committed."

- Loetschert lived in Florida, at Mazer's house, from January 2004 through March 24, 2004. Am. Compl. at ¶¶ 44-46.

- While living in Florida, Loetschert, as an agent of APM, told Mazer that the price DiLorenzo wanted for the blueprints was too high, decided with Mazer the price West-Hem would pay DiLorenzo for the blueprints, and helped West-Hem negotiate the price with DiLorenzo. Id. ¶¶ 48, 135.

- Loetschert, while in Florida, provided a portion of the cash that Mazer had sent to DiLorenzo as West-Hem's payment for the blueprints. Id. ¶¶ 49, 139.

- While in Florida, and in order to avoid taking a copy of the blueprints with him when he returned to Belgium, Loetschert arranged for Mazer to ship the copy of the blueprints from West-Hem's Florida office to APM's office in Belgium, via West-Hem's Federal Express account. Id. ¶¶ 51, 141.

- "APM, through its agent Loetschert, actively planned and participated in the theft of the Blueprints while Loetschert was living with Mazer in Florida." Id. ¶ 60.

All of the other allegations in the complaint relating to APM either involve conduct outside of Florida or do not state where the conduct took place.[17]

_____

[17]  For example, UTC's complaint alleges that APM "paid West Hem and Mazer approximately $25,000 for the stolen Blueprints in 2004"; "purchased the stolen Blueprints from West Hem at a far lower price than it would have paid to Pratt"; and "knew that the market value of these Blueprints was greatly in excess of $25,000." Am. Compl. at ¶¶ 52, 56, 59, 143. However, the allegations of the complaint are unclear about whether APM made this payment or had this knowledge while Loetschert was in Florida or only after he had returned to Belgium. Incidentally, in the Dunphy Report, on which UTC relies but which we find to be inadmissible and otherwise decline to consider as discussed infra, Mazer is reported to have said that he does not believe that APM ever actually paid anything on the West-Hem invoice for the blueprints. These allegations, as pled, are insufficient to establish tortious conduct by APM in Florida.

These allegations appear to be sufficient to establish a prima facie case for the exercise of personal jurisdiction over APM. However, APM, through its submission of Loetschert's affidavit, has specifically denied each allegation. UTC, citing Posner as an analogous case, contends that Loetschert offered no more than conclusory denials that the court should disregard. In Posner, we found the defendant's affidavit, offered to challenge the plaintiffs' jurisdictional allegations, to be "of little significance." Posner, 178 F.3d at 1215. Specifically, we observed,

> The affidavit primarily explains [the defendant's] corporate structure and status; summarily asserts that [the defendant] has never done business in or directed contacts into Florida; admits certain peripheral connections with the state; and denies in a conclusory way any other actions that would bring [the defendant] within the ambit of Florida's long-arm statute. For example, paragraph five covers three-quarters of a page and contends, by reciting the long-arm statute essentially verbatim, that the jurisdictional statute does not apply to [the defendant]. Such statements, although presented in the form of factual declarations, are in substance legal conclusions that do not trigger a duty for Plaintiffs to respond with evidence of their own supporting jurisdiction.

Id. Accordingly, we considered "only those portions of the [affidavit] that set forth specific factual declarations within the affiant's personal knowledge." Id.

Loetschert's affidavit, in contrast, is not so conclusory and, as such, merits our consideration. The affidavit does start with a brief description of APM's

26

corporate structure, admit certain peripheral connections between Loetschert and the state and between APM and the other parties, and include the conclusory assertion that "[n]either I nor APM committed any tortious or criminal acts within the territorial jurisdiction of this Court," Loetschert Affidavit at ¶¶ 2-5, 13-16, but it does not end there. Rather, Loetschert goes on to deny – specifically, based on his personal knowledge, and under penalty of perjury – numerous factual allegations lodged by UTC.[18] These specific factual denials include:

- "At no time while I was in Florida did I conduct business transactions on behalf of APM." Id. ¶ 11.

- "Neither I nor APM 'actively planned and participated in the theft of the Blueprints' while I was living in Florida." Id. ¶ 24.

- "APM, at no time (including the time I was staying in Florida) ever assisted Defendant West-Hem in negotiating a price for the blueprints with Anthony DiLorenzo, and did not decide, alone or together with anyone, what Defendant West-Hem should pay Mr. DiLorenzo for those blueprints." Id. ¶ 28.

- "I never provided 'a portion of the cash that Mazer instructed West Hem employees to send to DiLorenzo as payment for the Blueprints.'" Id. ¶ 30.

---

[18] Loetschert also makes several specific factual assertions regarding APM's lack of business ties to Florida relevant to the question of general jurisdiction, to wit: "APM is not registered with the Florida Secretary of State to transact business in Florida"; "APM does not conduct business in the Southern District of Florida, specifically, or in the State of Florida, in general"; "APM has no business office in Florida"; "APM does not own or lease any real property in Florida"; and "APM does not maintain a depository or bank account in Florida." Loetschert Affidavit at ¶¶ 6-10.

- "I never arranged with Defendant Mazer to ship the blueprints to APM in Belgium 'to avoid taking the copy of the stolen Blueprints on the plane with [me] when [I] returned to Belgium.' In fact, it is my understanding that the full set of blueprints in question were not received by Defendants Mazer or West-Hem until after I had already left, in March, 2004, the United States for Belgium." Id. ¶ 31.

These statements are not mere legal conclusions; they are specific factual denials that challenge each and every factual allegation raised by UTC regarding APM's conduct in Florida in connection with the Pratt blueprints.[19] These "specific factual declarations within the affiant's personal knowledge," in contrast to those in the affidavit in Posner, are sufficient "to shift to the Plaintiff[] the burden of producing evidence supporting jurisdiction." Posner, 178 F.3d at 1215.

UTC attempted to respond and establish jurisdiction by means of Mazer's purported statements about APM and Loetschert contained in the Dunphy Report, but the district court found these statements to be inadmissable hearsay and declined to consider them. In so deciding, the district court did not abuse its discretion. See United States v. Brown, 441 F.3d 1330, 1359 (11th Cir. 2006) ("We review a district court's hearsay ruling for abuse of discretion.").

---

[19] To the extent, if any, that UTC's allegations regarding APM's knowledge of the true value of the blueprints may be relevant to the jurisdictional inquiry, see supra note 17, Loetschert also specifically denies those allegations: according to his affidavit, "APM did not 'knowingly and wrongfully' obtain the blueprints at a 'black market, below value price,'" and "APM, at all times relevant to this lawsuit, never knew that the value of the blueprints in question 'was greatly in excess of $5,000,' that the market value was 'greatly in excess of $25,000,' or that they were the 'protected property of Pratt.'" Loetschert Affidavit at ¶¶ 18, 22.

28

UTC argues that Mazer's statements in the Dunphy Report should have been considered under the exceptions to the rule against hearsay for (1) records of regularly conducted business activity, and (2) public records and reports. Fed. R. Evid. 803(6), (8). For the exceptions to apply, the report must contain "factual findings" that are "based upon the knowledge or observations of the preparer of the report," as opposed to a mere collection of statements from a witness. Miller v. Field, 35 F.3d 1088, 1091 (6th Cir. 1994). "It is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted but that statements made by third persons under no business duty to report may not." United States v. Pazsint, 703 F.2d 420, 424 (9th Cir. 1983) (finding Rule 803(6) inapplicable); see also Miller, 35 F.3d at 1091 (finding Rule 803(8) inapplicable); Parsons v. Honeywell, Inc., 929 F.2d 901, 907 (2d Cir. 1991) (same). In other words, "[p]lacing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible." Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp., 407 F. Supp. 2d 1304, 1315 n.2 (S.D. Fla. 2005), aff'd in part, vacated in part on other grounds, 531 F.3d 1339 (11th Cir. 2008).

Here, while we need not decide whether the Dunphy Report itself is subject to the asserted exceptions, the pertinent point is that we can say with confidence

29

that Rules 803(6) and (8) cannot render admissible Mazer's hearsay statements contained within the report. See Fed. R. Evid. 805. "Hearsay within hearsay subject to an exception is not admissible." Joseph v. Kimple, 343 F. Supp. 2d 1196, 1204 (S.D. Ga. 2004). Therefore, UTC cannot rely on Mazer's purported statements in the Dunphy Report to establish jurisdiction in opposition to the Loetschert affidavit unless those statements themselves are subject to a hearsay exception.

UTC suggests that Mazer's statements in the Dunphy Report could be viewed as non-hearsay admissions because Mazer is a director and part owner of APM. Federal Rule of Evidence 801(d)(2) provides that a statement is not hearsay if:

> The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy. The contents of the statement shall be considered but are not alone sufficient to establish the declarant's authority under subdivision (C), the agency or employment relationship and scope thereof under subdivision (D), or the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E).

However, there is no evidence – and no reason to assume – that Mazer's statements to government investigators, made while he himself was facing criminal charges, were made in a representative capacity on behalf of APM, that APM adopted those statements, or that Mazer was authorized to make the statements on APM's behalf.  Furthermore, because Mazer's statements relate to his and/or West-Hem's sale of the blueprints <u>to</u> APM, they cannot also concern a matter within the scope of his agency or employment, if any, <u>for</u> APM.[20] Moreover, even assuming <u>arguendo</u> that Mazer and APM were co-conspirators, Mazer's statements essentially confessing to the misconduct cannot constitute statements by a co-conspirator during the course and in furtherance of that same conspiracy.  Thus, any admissions contained in the Dunphy Report are Mazer's alone; they cannot be attributed to APM.

Mazer's unsworn, unattested statements in the Dunphy Report also are not admissible under the residual exception to the hearsay rule.  Fed. R. Evid. 807.[21]

---

[20] Although UTC's complaint repeatedly alleges that Mazer was acting on behalf of West-Hem, there is no allegation that Mazer was acting on behalf of APM.

[21] Rule 807 provides:
A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.  However, a statement may

31

"Congress intended the residual hearsay exception to be used very rarely, and only in exceptional circumstances," United States v. Ingram, 501 F.3d 963, 967 (8th Cir. 2007), and it "appl[ies] only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present," United States v. Wright, 363 F.3d 237, 245 (3d Cir. 2004). Notwithstanding the proffer agreement under which Mazer submitted to the government interview, Mazer's position as a target in a criminal investigation provided him ample motivation to implicate others (even falsely), including APM, in his misconduct in order to diffuse and mitigate his own culpability. Thus, the statements lack the "equivalent circumstantial guarantees of trustworthiness" that Rule 807 requires. Moreover, Mazer's statements are not "more probative on the point for which [they are] offered than any other evidence which the proponent can procure through reasonable efforts." Fed. R. Evid. 807. As further explained below, UTC could have taken reasonable steps to obtain admissible testimony directly from Mazer prior to the district court's ruling on APM's motion to dismiss, but it failed to do so. As such, Rule 807 cannot salvage the admissibility

not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Fed. R. Evid. 807.

of Mazer's statements in the Dunphy Report.

At oral argument, UTC further argued that Mazer's statements, because he had a financial stake in APM, constituted statements against interest subject to the exception to the hearsay rule set forth in Rule 804(b)(3) of the Federal Rules of Evidence. Because UTC did not raise this argument in its opening brief (or at all in the district court), it has likely been abandoned. Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 972 (11th Cir. 2008); Millennium Partners, L.P. v. Colmar Storage, LLC, 494 F.3d 1293, 1304 (11th Cir. 2007) ("Arguments raised for the first time on appeal are not properly before this Court."). Even if we were to consider this argument, however, it lacks merit for two reasons. First, Rule 804(b)(3) only applies where the declarant is unavailable, and UTC has made no showing that Mazer was unavailable to give competent testimony. Indeed, UTC reasonably could have taken, but failed to take, reasonable steps to obtain Mazer's direct testimony. Second, while it appears to be true that Mazer had an ownership interest in APM and indirectly might have stood to lose money if APM were implicated in the theft and sale of the Pratt blueprints and thereafter subjected to civil or criminal liability, the criminal charges pending against Mazer would have been a substantially greater concern to a reasonable person in Mazer's position. Therefore, it is reasonable to infer that spreading blame for the misconduct by

implicating others, even falsely, could have been at least as big a priority for Mazer at the time of his interview with government investigators as would have been protecting his financial stake in APM. Accordingly, the facts do not compel a conclusion that Mazer's statements pertaining to APM were "at the time of [their] making so far contrary to [Mazer's] pecuniary or proprietary interest . . . that a reasonable person in [Mazer's] position would not have made the statement unless believing it to be true." Fed. R. Evid. 804(b)(3).

In sum, while the Dunphy Report itself might be hearsay subject to an exception, Mazer's statements contained within the report are themselves hearsay statements, and the rules of evidence require that, for hearsay within hearsay to be admissible, "each part of the combined statements [must] conform[] with an exception to the hearsay rule." Fed. R. Evid. 805. Yet no exception applies to the Mazer statements. Accordingly, we find no abuse of discretion in the district court's decision to disregard those statements.

UTC, therefore, has proffered no competent evidence to establish jurisdiction in opposition to the denials of the jurisdictional allegations contained in Loetschert's affidavit. Under such circumstances, the district court correctly found Loetschert's unrebutted denials sufficient to negate UTC's jurisdictional allegations tying APM to tortious conduct in Florida. Consequently, the district

34

court properly concluded that it lacked personal jurisdiction over APM under Florida's long-arm statute.

Before leaving this topic, we must briefly address UTC's argument that, rather than dismissing for lack of personal jurisdiction over APM, the district court should have deferred a ruling on APM's motion and granted UTC's "requests" for jurisdictional discovery, including the taking of Mazer and Loetschert's depositions.[22] Initially, "[t]he court's denial, grant, or limitation of a motion for discovery is reviewed for abuse of discretion." Lowery v. Ala. Power Co., 483 F.3d 1184, 1218 n.76 (11th Cir. 2007). Here, UTC expressly recognized the potential utility of jurisdictional discovery at least by the time it filed its response to APM's motion to dismiss on April 27, 2006. However, UTC never formally moved the district court for jurisdictional discovery but, instead, buried such requests in its briefs as a proposed alternative to dismissing APM on the state of the current record. Furthermore, UTC does not appear to have served notices for Mazer or Loetschert's depositions – which notices manifested UTC's understanding of its ability to seek discovery during the pendency of APM's motion to dismiss – until late July and early August 2006. Thereafter, though

_____

[22] Tragically, we note that Loetschert perished in a helicopter accident on December 26, 2007. Therefore, even if we were to reinstate the case against APM, Loetschert would not be available for a deposition or to testify at any trial.

UTC claims to have been informally working through scheduling issues with the witnesses and responding to APM's objections to the sufficiency of UTC's deposition notice for Loetschert, UTC failed to take any formal action to compel discovery or properly issue an internationally effective subpoena for Loetschert's testimony.

All in all, UTC should have taken every step possible to signal to the district court its immediate need for such discovery. But, despite the obvious urgency of the situation, it failed to take any of these reasonable steps to seek discovery, or a deferral of a ruling pending discovery, during the more than four months APM's motion was pending. "The district court, therefore, did not so much deny discovery as it dismissed the case before discovery was taken. We cannot say that the district court erred," Posner, 178 F.3d at 1214 n.7, much less abused its discretion.

Finally, we address whether UTC's conspiracy claim is sufficient to justify the exercise of personal jurisdiction in Florida over APM. The district court held that, because "[n]one of the Complaint's allegations involve an actionable tort in Florida," "there is no underlying tort [in Florida] to support a conspiracy claim. As a result, personal jurisdiction does not exist over APM, a foreign corporation, on the conspiracy claim under Florida's long-arm statute."

Under Florida law, a civil conspiracy must have as its object the commission of an underlying tort. Whether the underlying tort must have been completed (and thus be independently actionable), however, is open to question. The Florida courts have been somewhat divided concerning the answer to this question. Compare Raimi v. Furlong, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997) ("[A]n actionable conspiracy requires an actionable underlying tort or wrong."); Rushing v. Bosse, 652 So. 2d 869, 875 (Fla. 4th DCA 1995) (same); Florida Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam County, 616 So. 2d 562, 565 (Fla. 5th DCA 1993) (same), with Wilcox v. Stout, 637 So. 2d 335, 336 (Fla. 2d DCA 1994) ("Florida recognizes that civil conspiracies may exist as an independent tort."); see also Walters v. Blankenship, 931 So. 2d 137, 140 (Fla. 5th DCA 2006) ("As for the count of civil conspiracy, we conclude it is viable, based either on the underlying tortious interference count or as an independent tort . . . . Generally an actionable conspiracy requires an actionable underlying tort or wrong . . . . However, an alternative basis for a civil conspiracy claim exists where the plaintiff can show some 'peculiar power of coercion' possessed by the conspirators by virtue of their combination, which an individual acting alone does not possess." (citations omitted)).

In this appeal, however, we need not enter the morass of whether or when

Florida law requires an independent tort to support a civil conspiracy claim because, in any event, UTC's conspiracy allegations are insufficient to justify the exercise of personal jurisdiction over APM. Florida courts have held that the state's long-arm statute can support personal jurisdiction over any alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy, even if the defendant over whom personal jurisdiction is sought individually committed no act in, or had no relevant contact with, Florida. See Machtinger v. Inertial Airline Servs., Inc., 937 So. 2d 730, 734-36 (Fla. 3d DCA 2006) (finding personal jurisdiction existed in Florida where conspiracy was made in Ohio but acts in furtherance of the conspiracy were done in and directed toward Florida); Wilcox, 637 So. 2d at 337 ("if [plaintiff] has successfully alleged that any member of that conspiracy committed tortious acts in Florida in furtherance of that conspiracy, then all of the conspirators are subject to the jurisdiction of the state of Florida through its long-arm statute"); see also Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co., 752 So. 2d 582, 584-85 (Fla. 2000) (finding personal jurisdiction in Florida over participant in a nationwide price-fixing conspiracy in which some co-conspirators, but not the defendant at issue, made sales into Florida).

Here, in contrast, UTC has alleged nothing that clearly connected APM to a

conspiracy made or carried out in Florida. At the threshold, as explained above, we cannot consider the allegations about APM's conduct in Florida because the Loetschert affidavit, which UTC has failed to rebut with competent evidence, specifically denies those allegations. Thus, any conspiracy-based exercise of personal jurisdiction must be founded on conduct committed in Florida by others that can be attributed to APM as a co-conspirator.

The gist of the conspiracy described in the complaint can be described as, primarily, a conspiracy to steal the Pratt blueprints and, secondarily, a conspiracy to resell the already-stolen blueprints. The conspiracy to steal the blueprints was allegedly made between Mazer and DiLorenzo, ostensibly in Connecticut (not Florida), at some time before the actual theft, which occurred "between February 2004 and March 2004." Am. Compl. at ¶ 24. Moreover, the theft itself occurred in Connecticut. See April Indus., Inc. v. Levy, 411 So. 2d 303, 305-06 (Fla. 3d DCA 1982) (finding no personal jurisdiction in Florida where, even assuming a conspiracy was made in Florida, the tortious act essential to causing the alleged wrong occurred in New York). To tie APM to this conspiracy to steal in a manner adequate to support personal jurisdiction in Florida, UTC had to allege unambiguously that APM was involved in a Florida-based agreement to steal – i.e., involved in a meeting of the minds with at least one other co-conspirator –

39

before the time of the theft. See, Charles, 988 So. 2d at 1159 ("A civil conspiracy requires: (a) an agreement between two or more parties . . . .").

Yet there is no allegation directly connecting APM to this initial agreement to steal the blueprints. At most, UTC's complaint alleges that APM's managing director Loetschert was living in Florida with Mazer from January 2004 until March 24, 2004. UTC does not allege explicitly that Loetschert, while in Florida, was in on the formation of the plot to steal the blueprints; rather, it asks us to infer from the overlap between this time period and the period during which the theft occurred that Loetschert participated in the formation of the plot. Such inference cannot reasonably be made. It requires too great a speculative leap to find that, just because he may have been in Florida at the time of the theft, Loetschert must have been involved initially in the plot to steal the blueprints. Moreover, the timeline set forth in the complaint yields other inferences. Mazer first met with DiLorenzo in Connecticut – and discussed an interest in purchasing the JT8D blueprints – in November 2003. Am. Compl. at ¶¶ 15-16. Hence, it is entirely possible that Mazer and DiLorenzo reached their agreement to steal (and to have DiLorenzo sell Mazer the stolen blueprints) as early as November 2003, all without Loetschert's knowledge or involvement and well before Loetschert's early 2004 trip to Florida. On balance, the complaint's allegations are simply too

ambiguous to connect Loetschert and APM to the formation of the conspiracy to steal the Pratt blueprints.

Nor does viewing the relevant conspiracy as one to resell the already-stolen blueprints to APM aid UTC's cause. This form of a conspiracy would require an allegation that APM not only agreed to purchase the blueprints (or actually purchased them) in Florida but also, at the time it agreed to purchase them, knew that the blueprints would be stolen. But, again, the denials in the Loetschert affidavit, which are unrebutted by any competent evidence, have effectively negated UTC's allegations regarding APM's knowledge of the illicit character of the blueprints. Accordingly, UTC has failed to establish directly that APM entered into a conspiracy knowingly to purchase stolen blueprints that was either formed or in any way carried out in Florida.

In sum, the complaint does not allege viable facts from which the inference could reasonably be drawn that APM was part of a conspiracy either engineered in Florida or pursuant to which a tortious act in furtherance was committed in Florida. Thus, APM is not subject to conspiracy-imputed personal jurisdiction under Florida's long-arm statute. See Arch Aluminum & Glass Co. v. Haney, 964 So. 2d 228, 234-35 (Fla. 4th DCA 2007) (finding no personal jurisdiction where neither the conspiracy nor the underlying tort occurred in Florida).

## IV.

The district court did not err in dismissing the claims against APM for lack of personal jurisdiction. We therefore AFFIRM the court's judgment for APM. However, the district court did err in dismissing the claims against West-Hem for failure to state a claim for relief. We accordingly REVERSE the court's judgment for West-Hem and REMAND the case for further proceedings against West-Hem.

AFFIRMED, in part, REVERSED, in part, and REMANDED.