Nesrean Husam **SHEHADA**, as personal representative of the estate of Husien Husam Shehada, Samer Shehada, Karlia Karpel, and Natasha Johnson, Plaintiffs,

v.

Adam **TAVSS**, individually, and the City of Miami Beach, Defendants.

Case No. 11–22051–CV.

United States District Court, S.D. Florida.

March 27, 2013.

John Patrick Contini, John P. Contini & Associates, Fort Lauderdale, FL, Gregory Antonio Samms, Gregory A. Samms, Coral Gables, FL, for Plaintiffs.

Robert F. Rosenwald, Jr., City of Miami Beach, Candace Diane Cronan, Robert L. Switkes, Robert L. Switkes & Associates, P.A., Miami Beach, FL, Joshua Michael Entin, Entin & Della Fera, P.A., Fort Lauderdale, FL, for Defendants.

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT CITY OF MIAMI BEACH'S MOTION FOR SUMMARY JUDGMENT (D.E. 141) AND DENYING AS MOOT DEFENDANT CITY OF MIAMI BEACH'S MOTION TO DISMISS (D.E. 6)

JOAN A. LENARD, District Judge.

**THIS CAUSE** is before the Court on Defendant City of Miami Beach's Motion for Summary Judgment (D.E. 141, 10/31/12). Plaintiffs Neserean Husam Sheada, Samer Shehada, Karlia Karpel, and Natasha Johnson filed an Amended Response in Opposition (D.E. 146, 12/3/12), and the City filed a Reply (D.E. 152, 1/4/13). Also before the Court is the City's Motion to Dismiss Plaintiffs' Complaint (D.E. 66, 3/15/12) and Plaintiffs' Response to that Motion (D.E. 70, 4/1/12). Having considered the referenced filings, related pleadings, and record, the Court finds as follows.

## I. Background

The following facts are either undisputed or taken in a light most favorable to Plaintiffs.

### a. Subject Incident

In June 2009, Samer and Husien Husam Shehada were vacationing in Miami Beach with their respective girlfriends, Karlia Karpel and Natasha Johnson. (Plaintiffs' Statement of Material Facts, D.E. 120 ¶¶ 1, 2.)

On the night of June 14, 2009, Samer, Husien, Karlia, and Natasha went to a nightclub in Miami Beach. (*Id.* ¶ 3.) They drank alcohol while at the nightclub. (*Id.*)

Samer and Karlia left the club at about 3:30 a.m. (*Id.* ¶ 4.) They became involved in an argument on their way out, and Samer pushed Karlia to the ground. (*Id.* ¶ 5.) Three bystanders saw what happened and began hitting Samer. (*Id.* ¶ 6.) At some point the altercation ended, and Samer and Karlia proceeded back to their hotel. (*Id.* ¶ 7.) Husien and Natasha returned to the hotel roughly an hour and a half later. (*Id.* ¶ 9.)

Back at the hotel, Samer and Husien discussed the altercation and decided to go find Samer's assailants. (*Id.* ¶ 10.) Husien grabbed a large wooden hanger before they left. (*Id.* ¶ 11.) Samer took the hanger and placed it under his shirt. (*Id.*) The hanger was allegedly for self-defense in case they confronted Samer's attackers. (*Id.*)

Samer and Husien exited the hotel and began walking south on Washington Avenue. (*See id.* ¶ 12.) They were wearing white t-shirts and blue jeans. (*Id.*) The hanger created a visible, linear bulge in Samer's shirt. (*See* Ex. A to Defendant Tavss's Reply in Support of Summary Judgment.) Meanwhile, Karlia and Natasha followed somewhere behind. (Plain-

tiffs' Statement of Material Facts, D.E. 120 ¶ 12.)

As Samer and Husien walked down the street, several people noticed the bulge in Samer's shirt and began calling the police. (*Id.* ¶ 13.) Callers reported that two Latino males in jeans and white t-shirts were heading south on Washington Avenue, that one appeared to be concealing a firearm, and that the subjects were moving fast and looked upset. (*See id.* ¶¶ 13–14; Defendant Tavss's Statement of Facts, D.E. 105 ¶ 17.) Officers were dispatched to canvas the area. (Plaintiffs' Statement of Material Facts, D.E. 120 ¶¶ 14–15, 28.)

Miami Beach Police Officer Donald Anderson approached in his cruiser driving south on Washington Avenue. (*Id.* ¶ 15.) Officer Anderson noticed two people on his left, Samer and Husien, who matched the description of the suspects. (*Id.*) He then saw Samer and Husien turn around and begin walking northbound. (*Id.*) Officer Anderson made a U-turn to follow them. (*Id.*) He drove about twenty feet past them and parked at an angle to the curb. (*Id.*)

Miami Beach Police Officer Adam Tavss pulled up in his own patrol car and stopped three or four car-lengths south of Officer Anderson's vehicle. (Defendant Tavss's Statement of Facts, D.E. 105 ¶ 26.) Another cruiser approached from the east, heading across a side street just north of Samer and Husien. (*See* Samer Dep., D.E. 106–3 at 115–19.) Also nearby and responding on foot were Officers Gustavo Blacio and Anthony Loperfido. (Plaintiffs' Statement of Material Facts, D.E. 120 ¶¶ 28–34.)

Officer Anderson exited his vehicle, drew his weapon, and yelled at Samer and Husien twice to show him their hands. (*Id.* ¶¶ 15, 16.) The record evidence, viewed in a light most favorable to Plaintiffs, reveals that within about two seconds Husien turned west toward Officer Anderson and placed his arms straight up in the air. (Samer Dep., D.E. 106–4 at 203; *see also* Surveillance Video, Plaintiffs' Ex. 6.) His palms were open and he was not holding anything. (Samer Dep., D.E. 106–4 at 203, 207.) Samer, who had been walking slightly behind and to the right of Husien, walked around to Husien's right side, faced the street, and nudged himself between Husien's right shoulder and a lamppost. (*See* Samer Dep., D.E. 106–3 at 121; *see also* Surveillance Video, Plaintiffs' Ex. 6.) Samer testified that "when I heard that verbal command from that officer that's when I put my hands up and turned around, but when I turned—if I would have just stopped there I would have been directly behind my brother, so I kind of went around my brother so that police officer could see me with my hands up." (Samer Dep., D.E. 106–3 at 121.) Samer came to a stop about three to four seconds after Husien (*see* Surveillance Video, Plaintiffs' Ex. 6.) and placed his arms in the shape of a "W" with his forearms and hands up (Samer Dep., D.E. 106–4 at 202). His palms were open and empty. (*Id.* at 203.) According to Samer, neither he nor Husien reached for anything or made any furtive movements after raising their arms. (*See* Samer Dep., D.E. 106–3 at 119–21, 106–4 at 204–07.) Samer's deposition testimony indicates specifically that there was "no way [Husien] could have reached for anything, his arms were up"; that Husien did not "make any movement after his hands were raised to take his hands down to reach for anything before the shooting"; and Samer himself did not "move [his] hands down to reach for anything after [he] put [his] hands up before the shooting." (Samer Dep., 106–4 at 205–06.) The confrontation was recorded in part by a street surveillance camera, but the video quality and vantage point make it difficult to see what Samer and Husien

did with their hands and arms in the course of the stop. (*See* Plaintiffs' Ex. 6.)

About one second after Samer had stopped and situated himself, Officer Tavss discharged his firearm and shot Husien in the left upper arm. (Defendant Tavss's Statement of Facts, D.E. 105 ¶ 37; Plaintiffs' Ex. 6.) Husien fell to the ground. (Plaintiffs' Ex. 6.) Samer stumbled back as well but was not harmed. (*See* Plaintiffs' Statement of Material Facts, D.E. 120 ¶ 44.) Officers then moved in to secure the scene. (Defendant's Statement of Facts, D.E. 105 ¶ 40.)

Husien was brought to the hospital but pronounced dead on arrival. (*Id.* ¶ 42.) The bullet had entered Husien's chest cavity and perforated his aorta. (*Id.* ¶ 44.)

Karlia and Natasha arrived at the scene shortly after the shooting. (*See* Amended Response in Opposition to City's Motion for Summary Judgment, D.E. 146 at 36.) They were approached by police officers and brought to the Miami Beach Police Department. (*Id.*) They were allegedly detained for over twelve hours despite repeated requests to leave and learn of Husien's condition. (*Id.* at 36–37.)

Officer Tavss was neither terminated nor disciplined by the police department following the incident. (*See id.* at 35.)

### b. The Police Department's Standard Operating and Training Procedures

The Miami Beach Police Department has promulgated standard operating procedures that govern police conduct and that address, among other things, appropriate uses of force and firearms. (City's Statement of Undisputed Facts, D.E. 139 ¶ 1.) The operating procedures are based on standards developed by the Commission on Accreditation for Law Enforcement Agencies and the Commission for Florida Law Enforcement Accreditation.

(*Id.*) The police department was audited and accredited by the Commission in 2003, 2006, and 2009. (*Id.* ¶ 2.)

The department conducts frequent, mandated training courses on lawful use of force and firearms. (*Id.* ¶ 3.) All Miami Beach police officers receive mandatory training and annual retraining on the use of their firearms and appropriate uses of deadly and nondeadly force. (*Id.* ¶¶ 3–4.) Officers are trained specifically on the legal standards governing use of deadly force, how to recognize "deadly-force situations," how to employ deadly force, and what to expect and do after an officer-involved shooting. (*Id.* ¶ 4.)

### c. Internal Affairs Unit and Prior Complaints of Officer Misconduct

The Miami Beach Police Department has an Internal Affairs unit which logs and investigates all complaints of officer misconduct. (*See id.* ¶ 9.) Internal Affairs investigators are supervisory in rank. (*Id.*) When a complaint is received, an investigation is conducted and a report containing findings and recommendations is prepared for the police chief. (*Id.*) A complaint of misconduct is found "unsubstantiated" when the evidence is in conflict and favors neither one side nor the other. (*Id.* ¶ 10.) A disposition of "unfounded" or "exonerated" indicates that the complaint has no merit and the accused officer was not at fault. (*Id.*) A complaint is found "substantiated" where a violation is supported by a preponderance of the evidence. (*Id.*) If a charge is found substantiated, disciplinary action is taken based on the seriousness of the officer's offense. (*Id.* ¶ 11.)

The Miami Beach Police Department's Internal Affairs unit investigated 309 complaints of officer misconduct between 2002 and 2009. (*Id.* ¶ 6.)

Plaintiffs claim that on nineteen specific occasions, officers used excessive force on subjects and Internal Affairs failed to properly investigate and take disciplinary action. (*See* Amended Response in Opposition to City's Motion for Summary Judgment, D.E. 146 at 11–35.) Plaintiffs set forth summaries of each alleged incident in their Statement of Material Facts. (*See id.*) The summaries are derived exclusively from the Internal Affairs unit's investigative reports. (*See id.*) The following are examples of Plaintiffs' incident summaries:

1. **I.A. Case No. 2007–048;** Victim Elisia Labruno; Subject Officer Detective Jose Reina. This case demonstrated the lack of any type of discipline for improper shootings conducted by the subject officer as well as fellow officers who suspected Mr. Labruno of committing a crime. On December 9, 2007 Mr. Labruno was a passenger in a cab on South Beach. Mr. Labruno apparently did not have fare to pay the cab driver and the cab driver took possession of Mr. Labruno's private possessions containing a tote bag. The cab driver attempted to drive off and Mr. Labruno jumped in through the window and the cab driver accidentally hit the gas pedal and fell out of the vehicle. Mr. Labruno retrieved his belongings and fled the scene. Numerous witnesses saw Mr. Labruno leave the scene and assisted the police in finding him. Once the police located him they chased him and Mr. Labruno was described as only having a shirt in his hands. (Pl. Ex. 1, 8–9).

An eyewitness specifically recalled seeing the shirt in Mr. Labruno's hand and Mr. Labruno testified himself in his sworn statement that he was only carrying a shirt. Mr. Labruno was chased by Detective Reina and other officers and while he was running witnesses heard a detective unleash three shots at Mr. La-

bruno while he was running unarmed. Witnesses then state that they heard after Mr. Labruno continued running, a second volley of shots that detectives fired at Mr. Labruno. (Pl. Ex. 1, 8–9).

The facts demonstrate that Mr. Labruno continued to flee in fear and hid beneath a vehicle. Though unarmed Mr. Labruno while underneath the car was fired upon again by Detective Reina who indicates that he hit Mr. Labruno. Mr. Labruno testified that he was shot prior to going underneath the car. (Pl. Ex. 1, 6–8).

The Internal Affairs Department evaluated this case and totally overlooked the fact that police officers were firing numerous shots in a crowded South Beach area with numerous civilians present at an unarmed man. When the unarmed man was cornered and in a position of surrender hiding underneath a vehicle he was shot once again. The Internal Affairs investigation glossed over the fact that Mr. Labruno was never armed and at the time that he was being fired upon by a number of detectives with numerous shots, that he was not a danger to himself, not a danger to others or the officers while he was fleeing with a shirt. The investigation conclusion found no reason for any officer involved to be cited for their improper use of their firearms or any excessive force and the matter was whitewashed by Internal Affairs. (Pl. Ex. 1, 19–20).

\* \* \* \* \* \*

5. **I.A. Case No. 2005–014.** Complainant: Officer Sunday Garcia. Officers involved: Douglas Simon, Dimitris Gotsis, and Thomas Lincoln.

Officer Sunday Garcia of the Miami Beach Police Department was working overtime in the North District on June 30, 2005. She responded to an assault

call on 73rd Street and Collins Avenue. When she arrived she saw a subject Angel Melendez on his stomach and in handcuffs. Officer Garcia of the Miami Beach Police Department was investigating and was talking to some homeless females about whether or not Mr. Melendez had previously had possession of a knife. [Pl. Ex. 7–6].

Officer Garcia then observed Sergeant Simon walk towards Mr. Melendez and while he was handcuffed, placed his foot on the left side of his face and started twisting his foot back and forth causing a pool of blood to emit from Mr. Melendez' face. Officer Garcia then saw Sergeant Simon have Mr. Melendez stand up and Sergeant Simon struck Mr. Melendez in the groin area with an extended asp leaving the asp on his groin. Officer Garcia indicated that Sergeant Simon was approximately 4 to 5 feet away from her. [Pl. Ex. 7–6].

Officer Garcia then saw Sergeant Simon place the asp on Melendez' neck by the carotid area and force the asp on his neck causing Mr. Melendez to walk to Sergeant De La Espriella's car. Sergeant Simon then bent Mr. Melendez over and proceeded to slam his head on the marked police vehicle three times causing a pool of blood to form on the hood. After the third time Sergeant Simon held Melendez' face on the hot hood with his forearm. [Pl. Ex. 7–6].

After that incident she saw Officer Gotsis jump-kick Melendez in the chest causing him to roll back completely in a circle. [Pl. Ex. 7–6].

The internal affairs investigator was able to corroborate that another officer observed the pool of blood on the vehicle's hood. [Pl. Ex. 7–7].

A civilian witness by the name of Carla Aaronson gave I.A. investigators a statement indicating she saw Mr. Melen-

dez being hit with the asp in the groin area and was then kicked in the chest by an arresting officer causing him to fall in the bushes. [Pl. Ex. 7, 8–9].

Another civilian witness named Ronnell Turner saw Officer Gotsis do the jump-kick to Mr. Melendez in the back area causing him to fall. He also saw the foot being placed on Melendez' face. [Pl. Ex. 7, 6–10].

Civilian witness Rosemarie Martin also saw the officer having his leg on Mr. Melendez' head and she also saw an officer come out of nowhere and kick Mr. Melendez in the chest. [Pl. Ex. 7, 11–12].

The internal affairs investigator found that an officer did place his foot on Mr. Melendez' face, that there was blood on the car where his face was placed, however the investigator refused to find any improprieties in regards to the batteries committed on Mr. Melendez. The investigator discounted the sworn testimony of an officer who initiated this complaint and every eye witness' version of what occurred. [Pl. Ex. 7, 26–31]. Instead the investigator chose to stretch the facts to find a way to blame the victim's injuries on someone other than the police officers who Officer Garcia saw beat Mr. Melendez. Mr. Melendez was intoxicated at the time of this incident and also is a homeless gentleman. The investigator used that to his advantage to discount the witnesses' versions of what happened to Mr. Melendez and then not agree with Mr. Melendez when his testimony indicated he was struck in the groin and beaten. [Pl. Ex. 7, 23–31].

However, once again the internal affairs department has no problem finding that violations occurred for failing to file paperwork to report the incident to supervisors. [Pl. Ex. 7–27]. Though the inve[s]tigator found that officer Gotsis

kicked Mr. Melendez twice, he found the kicking to be appropriate. [Pl. Ex. 7–29]. The Miami Beach Police Department has a consistent pattern of only finding filing or notice violations, but not the actual excessive force which gives rise to the filing violations that were committed.

\* \* \* \* \* \*

11. **I.A. Case No. 04–012.** The complainant is Mr. John Gibson. The officers involved are Detention Officer Booker Abercrombie.

On October 26, 2003 Mr. John Gibson was arrested for disorderly conduct. While he was in his cell he began taunting the officers in what he described as a humorous manner. [Pl. Ex. 13–3]. Detention Officer Abercrombie handcuffed Mr. Gibson and moved him from his cell. He was taken to a different cell and there he was sprayed with pepper spray and repeatedly punched in the face. [Pl. Ex. 13–3]. While he was being sprayed Officer Abercrombie made a series of inappropriate homosexual slurs as he was beating Mr. Gibson. [Pl. Ex. 13–3].

The Internal Affair[s] investigator found that the officers admitted to having an altercation with Mr. Abercrombie but found that the officers' version was plausible even though Mr. Gibson had facial injuries consistent with being beaten.

The investigating officer chose to not substantiate the battery charge and dismissed the physical evidence indicating that Mr. Gibson was beaten. [ Pl. Ex. 13–7]. The investigation confirms the Department's continual denial of physical evidence to come to an inappropriate conclusion that the officer did not use excessive force.

\* \* \* \* \* \*

13. **I.A. Case No. 2007–032.** The complainant is Juan Dapena. The involved officer is Jorge Mercado.

On June 21, 2007 Mr. Dapena and Officer Jorge Mercado were at a concert. Officer Mercado was off duty. Mr. Dapena became involved in a verbal altercation with Jorge Mercado at the Dade County Auditorium. [Pl. Ex. 15–4]. Mr. Dapena went into the restroom and was followed into the restroom by Officer Mercado. A verbal confrontation ensued in which both Officer Mercado and Mr. Dapena were standing face to face. [Pl. Ex. 15–4]. Officer Mercado then punched Mr. Dapena in the face while they're still in the bathroom. [Pl. Ex. 15–5]. This altercation was witnessed by an independent witness who did not know either of the individuals who told the internal affairs investigator that he saw the two men arguing and standing face to face and that Officer Mercado punched Mr. Dapena in the face. [Pl. Ex. 15–3]. Though Mr. Mercado had injuries consistent with being punched in the face and the detective did not deny punching the citizen in the face, the Miami Beach investigation still concluded that there was no battery and exonerated the detective. [Pl. Ex. 15–11].

Once again, even with physical evidence[,] witness[s] corroboration[,] and an admission by the detective, no finding of battery or even conduct unbecoming an officer was found against Detective Mercado who admitted to have been drinking that night. [ Pl. Ex. 15–11].

\* \* \* \* \* \*

19. **I.A. Case No. 02–040.** The complainant is the office of the chief. The victim is Flance Registe. The involved officer is Curtis Hodges.

On September 7, 2002, a call went out to the department that a truck was be-

ing burglarized. Mr. Flance Registe after arrest, admitted that he participated in the break-in of the van. [Pl. Ex. 21–3]. Mr. Registe indicated someone saw him so he left the area. Later he saw that he was being observed by police and he dropped the tools and hid inside of a hedge. [Pl. Ex. 21–3].

While Mr. Registe was lying beneath the hedge he heard an officer approach and felt someone tapping him on his shoes. [Pl. Ex. 21–4]. He was ordered out and he complied when he heard the officer unsnap his handcuffs he decided to flee. Registe testified that as he ran away he heard a bang and felt his leg go limp. Registe fell to the ground realizing he was shot.[ ] [Pl. Ex. 21–4]. Registe was handcuffed by the shooting officer, Officers Hodges. Registe[ ] testified that Officer Hodges said "I should have shot you in the head.[ ]" [Pl. Ex. 21–4].

The internal affairs investigator heard from witnesses that someone screamed for help. [Pl. Ex. 21–3]. His interview of the offending officer indicated the officer claimed to have been engaged in a struggle with Mr. Registe. [Pl. Ex. 21, 5–6]. However, the investigation made no note of any disturbance in Officer Hodge's clothing. There were no witnesses who overheard any type of struggle. [Pl. Ex. 21–3]. And the only witnesses' statements were that they heard the shot being fired without any sounds of a struggle before that. In fact one witness heard someone saying "don't you move, lay on the floor and put your hands up just before hearing the pop of a gun." [Pl. Ex. 21–3]. This indicates that Mr. Registe's claim is factually correct. The offending officer describes some type of struggle. The timing from the time the witness heard the officer tell Mr. Registe to stay still, from the

gunshot, was only seconds. [Pl. Ex. 21–3].

Though it is clear the facts do not support Officer Hodges' story, the internal affairs investigator chose to exonerate Officer Hodges for any excessive force internal violations. [Pl. Ex. 21, 7–8].

(*Id.*) In addition, Plaintiffs proffer expert testimony of Professional Law Enforcement and Corrections Trainer Roy Bedard, who opines based on seven particular incidents that the police department celebrates and encourages heavy-handed uses of force. (Plaintiffs' Statement of Material Facts, D.E. 146 ¶ 3.)

*d. Tavss's Personal History and Hiring*

In 1999, police were dispatched to Tavss's Miami home in response to an alleged domestic dispute. (*Id.* ¶ 9.) Tavss was alleged to have attacked then-girlfriend Risa Rindone by restraining her and placing a pillow on her face. (*Id.* ¶ 14.) A police report was completed in connection with the complaint. (*See id.* ¶ 9.) On another occasion, Tavss allegedly pushed Rindone against a car and hit her. (*Id.* ¶ 16.) Police responded to that incident as well. (*Id.*) Rindone applied for restraining orders against Tavss in Miami–Dade County and later Leon County, though the applications were apparently denied and Tavss was never informed of the filings. (City's Statement of Undisputed Facts, D.E. 139 ¶ 18.)

Tavss applied to work for and was hired by the Miami Beach Police Department in 2006. (*See* City's Ex. Z, D.E. 139–26 at 1.)

During his application process, Tavss was subjected to all tests, questionnaires, interviews, and background investigations mandated by the police department's standard operating procedures. (City's Statement of Undisputed Facts, D.E. 139 ¶ 17.) Tavss's background check revealed the

first alleged domestic dispute with Rindone. (Plaintiffs' Statement of Material Facts, D.E. 146 ¶ 8.) The police report from the incident was placed in Tavss's background file. (*Id.* ¶ 9.) The investigation also revealed Rindone's application for a restraining order in Miami–Dade County, though it did not turn up the application in Leon County. (City's Statement of Undisputed Facts, D.E. 139 ¶ 18.) During his interview, when asked if police had ever been sent to him home, Tavss answered, "Never." (Alberti Dep., D.E. 145–22 at 13.) Tavss evidently was referring to his home at the time of application—not the home he lived in at the time of the alleged domestic dispute with Rindone. (*Id.* at 13–14.) Tavss also denied on his employment application having ever injured a spouse or significant other. (*See* City's Ex. Z, D.E. 139–26 at 19.) A voice-stress analysis test supported the truthfulness of his claim. (City's Statement of Undisputed Facts, D.E. 139 ¶ 18.) The department did not contact Rindone to question her about the incident. (Plaintiffs' Statement of Material Facts, D.E. 146 ¶ 8.) Tavss's background check further revealed a juvenile arrest for loitering and about five traffic moving violations dating back to 1991. (*See* City's Ex. Z, D.E. 139–26 at 75.)

In 2008, Tavss was accused by another officer of using cocaine after a Christmas party. (*Id.* ¶¶ 27–30.) The accusation was relayed to superiors about seven months after the alleged incident, but Tavss passed a drug test and the allegations were found unsubstantiated by Internal Affairs. (City's Statement of Undisputed Facts, D.E. 139 ¶ 20.) Sometime during his employment while working as a jailer, Tavss accidentally allowed an inmate to escape a detention facility. (*Id.* ¶ 19) He received verbal counseling as a result. (*Id.*)

### e. Present Action

Plaintiffs filed this action against Tavss and the City of Miami Beach pursuant to 42 U.S.C. § 1983 and Florida state law. (*See* Second Amended Complaint, D.E. 58 at 1.) Plaintiffs allege, among other things, that Tavss's use of force was unconstitutionally excessive and violated Husien's Fourth Amendment rights. (*Id.* at 18.) Plaintiffs' Second Amended Complaint sets forth the following six counts against the City:

| Count | Basis of Claim | Allegation |
|-------|----------------|------------|
| I | 42 U.S.C. § 1983/ Fourth Amendment | Custom or policy of using excessive force causing deprivation of Husien's Fourth Amendment rights |
| III | Florida state law | Wrongful death of Husien |
| V | Florida state law | Battery of Husien |
| VI | Florida state law | Negligent hiring and retention of Tavss |
| VII | Florida state law | False imprisonment of Karlia and Natasha |
| VIII | Florida state Law | Assault of Samer |

(*See id.* at 16–18, 19–21, 22–28.)

## II. Motions

The City moves for summary judgment on Counts I, III, V, VI, and VIII. (*See* Motion, D.E. 141 at 1.) The City argues that Plaintiffs' claim of municipal liability under Section 1983 is unsustainable, as the record fails to establish any policy or custom by the Miami Beach Police Depart-

ment of using excessive force on subjects. (*Id.* at 2.) The City argues that it has implemented rigorous policies and training procedures addressing appropriate use of force by officers (*id.* at 2–6), and Plaintiffs are unable to show any pattern of violations or a failure by the City to investigate alleged officer misconduct (*id.* at 6–12). The City also argues that Plaintiffs' wrongful-death and assault claims are barred by sovereign immunity because Tavss's shooting was necessitated by an emergency situation; that the claims fail because the shooting was otherwise justified by a threat of force; and/or that the claims are precluded by Florida's statutory defense of plaintiff intoxication. (*Id.* at 12–17.) The City further argues that Plaintiffs' battery claim was extinguished by Husien's death (*id.* at 17–18) and that Plaintiffs' negligent-hiring-and-and-retention claim is barred by sovereign immunity and/or is factually unsustainable (*id.* at 18–21). The City does not seek summary judgment on Count VII, Karlia and Natasha's false-imprisonment claim. (*See id.* at 1.)

In response and in support of their municipal-liability claim, Plaintiffs cite nineteen Internal Affairs complaints between 2002 and 2009 involving allegations of excessive force by Miami Beach police officers. (Amended Response, D.E. 146 at 11–35.) Plaintiffs maintain on these nineteen occasions, officers employed excessive force and the department failed to take proper investigative and disciplinary action. (*Id.*) Plaintiffs claim that the nineteen complaints—plus the police department's failure to discipline Tavss following the subject incident—show deliberate indifference by the City to excessive-force issues so as to establish municipal liability under *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). (*Id.* at 40–43.) Plaintiffs also proffer expert opinion testimony

concluding, based on seven specific incidents, that the police department has fostered a culture of violence and fails to discipline misconduct. (*Id.* at 41.) Plaintiffs further argue that their wrongful-death and assault claims are not barred by sovereign immunity, as issues of fact exist as to whether Tavss's shooting was necessitated by an emergency. (*Id.* at 45.) Plaintiffs also argue that issues of fact exist as to whether the shooting was justified by a threat of force and whether Plaintiffs' intoxication precipitated their injury. (*Id.* at 46–48.) Plaintiffs concede that their battery claim is extinguished and/or subsumed into their wrongful-death claim. (*Id.* at 48–49.) Plaintiffs finally argue that Tavss's personal history, and the department's alleged failure to investigate his background and sanction his transgressions, raise issues of fact precluding summary judgment on their claim of negligent hiring and retention. (*Id.* at 50–54.)

The City replies, in relevant part, that the nineteen Internal Affairs complaints cited by Plaintiffs fail to sustain their deliberate-indifference claim. (Reply, D.E. 152 at 3.) The City argues that the complaints bear no similarity to the incident at issue in this case; that Plaintiffs credit each claimant's complaint without acknowledging the conflicting evidence and the thorough investigations conducted by Internal Affairs; and that in many cases the complaints were found substantiated and disciplinary action was taken. (*Id.*)

### III. Summary Judgment Standard

Summary judgment is appropriate if it is shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The Supreme Court has explained the summary judgment standard as follows:

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On a motion for summary judgment, the Court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505; *see also Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir.1989).

## IV. Discussion

### a. Section–1983 Claim of Excessive Use of Force (Count I)

Title 42, United States Code, Section 1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

Section 1983 imposes civil liability on any person who, under color of state law, "subjects, or causes to be subjected" a person "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." The provision provides civil remedies for deprivations of federal rights elsewhere conferred. *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994).

To state a claim under Section 1983, a plaintiff must allege facts showing that a person, under color of state law, deprived her of a right protected under the Constitution or laws of the United States. *See Little v. City of North Miami*, 805 F.2d 962, 965 (11th Cir.1986). A person acts under color of state law by acting with power possessed by virtue of the defendant's employment with the state. *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir.1995).

The alleged constitutional violation in this case arises under the Fourth Amendment, which protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Any claim that law enforcement officers used excessive force in the course of an arrest, investigatory stop, or other seizure of a citizen is analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

An officer's use of force is excessive under the Fourth Amendment if the use of force was "objectively [un]reasonable in light of the facts and circumstances

confronting" the officer. *Id.* at 397, 109 S.Ct. 1865. The totality of the circumstances must be considered, and the test of reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 109 S.Ct. 1865. Reasonableness is "judged from the perspective of the reasonable officer on the scene" without the benefit of hindsight. *Id.* This standard "allow[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865. Where an officer has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). But deadly force may not be used unless "necessary to prevent [ ] escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Id.* at 3, 105 S.Ct. 1694.

▮ A municipality can be a "person" subject to liability for a constitutional violation under Section 1983, but only when by "policy" or "custom" it causes the deprivation of a constitutional right. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690–91, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A policy is a decision that is officially adopted by the municipality or created by an official of such rank that he or she could be said to be acting on behalf of the municipality. *Brown v. City of Fort Lauderdale,* 923 F.2d 1474, 1479–80 (11th Cir.1991). A custom is a practice that is so settled and permanent that it takes on the force of law. *Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018.

▮ Where a municipality's failure to train or supervise its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants, such a shortcoming may constitute a "policy or custom" actionable under Section 1983. *City of Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "To establish a [municipality]'s deliberate indifference, 'a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action.'" *Lewis v. City of W. Palm Beach,* 561 F.3d 1288, 1293 (11th Cir.2009) (quoting *Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir.1998)).

"For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Canton,* 489 U.S. at 390 n. 10, 109 S.Ct. 1197 (citation omitted).

"It could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need." *Id.*

▮ Where a plaintiff attempts to show deliberate indifference through a pattern of past violations and a failure to take

appropriate action, "[ a] list of complaints against police officers, without more, is insufficient to create an issue of fact regarding [a municipality's] policy of inadequately investigating or disciplining its police officers. Rather, the Plaintiff must present at least some evidence from which a reasonable jury could infer that the complaints were meritorious." *Ayton v. Orange Cnty. Sheriff Dep't*, No. 6:10–cv–1930–Orl–28GJK, 2012 WL 4711911, at *3 (M.D.Fla. Oct. 3, 2012) (quotation omitted); *see also Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir.1987) ("[T]he number of complaints bears no relation to their validity.").

▇▇▇ "[W]hile 'factual findings' in internal affairs reports are generally admissible under an exception to the hearsay rule, Fed.R.Evid. 803(8), summaries of interviews that are contained in those reports are [ ] double hearsay that cannot be admitted at trial or considered on summary judgment." *Jessup v. Miami–Dade Cnty.*, 697 F.Supp.2d 1312, 1322 (S.D.Fla.2010) (citing *Roxbury–Smellie v. Fla. Dep't of Corr.*, 324 Fed.Appx. 783, 785 (11th Cir. 2009); *United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir.2009)).

▇▇▇ In short, "[s]imply dumping several thousand pages of investigative files on the Court ... cannot establish a genuine issue of material fact as to whether excessive force was used in any case, [where] the plaintiffs have offered no testimony from any complainant or other witness...." *Ott v. City of Mobile*, 169 F.Supp.2d 1301, 1313 (S.D.Ala.2001).

▇▇▇ Prior incidents also must involve facts substantially similar to those at hand in order to be relevant to a deliberate-indifference claim. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) ("[Plaintiff] was given a list of all cases involving excessive force, but he can-

not show that any of them involved factual situations that are substantially similar to the case at hand."); *Gold*, 151 F.3d at 1351 ("Gold presented no evidence of a single prior incident in which a City police officer caused an injury by excessive force in handcuffing."). And "random acts or isolated incidents are insufficient to establish a custom or policy." *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986).

▇▇▇ Furthermore, the failure to investigate or take disciplinary action following the subject incident cannot support a claim of municipal liability, because the after-the-fact inadequate investigation or discipline could not have been the legal cause of the plaintiff's injury. *See, e.g., Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir.1999) ("[A]n inadequate investigation into the January 22 shooting could not have caused Deputies Haltiner and Whitledge to use excessive force. Rather, Ms. Mettler would need to show that Ramsey County had failed to investigate previous incidents before a court could conclude the deputies at the time of the shooting believed a municipal custom allowed them to violate Shawn's rights with impunity."); *Bolander v. Taser Int'l, Inc.*, No. 07–cv–80789, 2009 WL 2004379, at *16 (S.D.Fla. Jul. 9, 2009) ("Even if the City conducted no investigation after the incident, Plaintiffs could not show that the failure to investigate caused the use of excessive force. A different result would simply result in respondeat superior liability.").

▇▇▇ In line with the foregoing, and construing the record in a light most favorable to Plaintiffs, the Court finds insufficient evidence of a "custom" or "policy" by the Miami Beach Police Department of using excessive force so as to subject the City to liability in this case. There is no dispute that the police department has promulgated standard operating proce-

dures that govern police conduct and that adequately address, among other things, appropriate uses of force and firearms. The department's operating procedures are based on standards developed by the Commission on Accreditation for Law Enforcement Agencies and the Commission for Florida Law Enforcement Accreditation. There is also no dispute that the department conducts frequent, mandated training courses on lawful use of force and firearms, and all Miami Beach police officers receive mandatory training and annual retraining on the appropriate use of deadly and non-deadly force. Accordingly, Plaintiffs attempt to establish municipal liability by alleging a history of officers using excessive force and of the department failing to investigate and discipline misconduct. The Court finds, however, that the complaints cited by Plaintiffs fail to sustain any showing of deliberate indifference. First, to support their versions of the prior episodes, Plaintiffs rely on inadmissible, third-party hearsay statements relayed within the Internal Affairs unit's investigative reports. Plaintiffs offer no evidence independent of the Internal Affairs reports themselves. Plaintiffs' evidence is thus not competent to prove the facts underlying each complaint, and there is thus insufficient evidence from which a trier of fact could find the prior complaints meritorious. Second, many of the alleged incidents bear little to no factual similarity to the instant case. Few involved the use of firearms, and not all even occurred in the course of an investigatory stop or emergency response. One was simply an altercation between an individual and an off-duty police officer. Third and perhaps most significantly, Plaintiffs ignore that each complaint was investigated by Internal Affairs, and that in each case Internal Affairs interviewed numerous witnesses and officers, collected and analyzed physical evidence, and prepared exhaustive findings and conclusions. And contrary to Plaintiff's assertions, in some cases violations were found and disciplinary measures were taken. Finally, to the extent that Tavss's use of force may have been unlawful in the case at bar, the department's failure to discipline or terminate Tavss following the subject incident cannot support Plaintiffs' deliberate-indifference claim, as it could not have been the legal cause of Husien's constitutional deprivation. For all these reasons, the Court finds Plaintiffs' evidence insufficient to show a widespread failure to train, investigate, or discipline officers regarding the appropriate use of firearms and deadly force, and the Court finds insufficient evidence to sustain municipal liability under *Monell* and *Canton*.

On this basis the Court grants the City's Motion for Summary Judgment as to Count I.

### b. Wrongful Death of Husien and Assault of Samer (Counts III and VIII)

With regard to Plaintiffs' wrongful-death and assault claims, the City argues first that it is entitled to sovereign immunity because Tavss's shooting was a discretionary measure taken in the course of pressing emergency situation.

■ The State of Florida has waived sovereign immunity in tort actions to a certain extent, *see* Fla. Stat. § 768.28, so a Florida municipality may be liable in *respondeat superior* for the tortious conduct of its employees, *Richardson v. City of Pompano Beach*, 511 So.2d 1121, 1123–24 (Fla.Dist.Ct.App.1987).

■ Florida's sovereign-immunity waiver does not apply, however, when the challenged acts are "discretionary" rather than "operational." *Kaisner v. Kolb*, 543 So.2d 732, 737 (Fla.1989). A "discretionary" function is one in which "the govern-

mental act in question involved an exercise of executive or legislative power such that, for the court to intervene by way of tort law, it inappropriately would entangle itself in fundamental questions of policy and planning." *Cook v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1117–18 (11th Cir. 2005) (citing *Henderson v. Bowden*, 737 So.2d 532, 538 (Fla.1999)). An "operational". function is not inherent in policy or planning but merely reflects a secondary decision as to how those policies or plans will be implemented, and is not entitled to sovereign immunity. *Id.* at 1118.

 "[W]hen an officer has made an initial discretionary decision to conduct a stop and then proceeds to carry out that decision, the officer is no longer exercising a 'discretionary' function, but is engaged in an 'operational' task." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1265 (11th Cir. 2001) (citing *Kaisner*, 543 So.2d at 734, 737–38). Likewise, "the decision as to whether use of a firearm is necessary is 'not necessary to or inherent in policy or planning,' and 'merely reflects a secondary decision as to how those policies or plans will be implemented.'" *Id.* at 1264 (quoting *Kaisner*, 543 So.2d at 737).

 Special deference is given during pressing emergencies, and certain police actions may involve a level of such urgency as to be considered discretionary rather than operational. *Kaisner*, 543 So.2d at 738 n. 3. But to fall within this emergency exception,

> the serious emergency must be one thrust upon the police by lawbreakers or other external forces, that requires them to choose between different risks posed to the public. In other words, no matter what decision police officers make, someone or some group will be put at risk; and officers thus are left no option but to choose between two different evils. It is this choice between risks that

is entitled to the protection of sovereign immunity in appropriate cases, because it involves what essentially is a discretionary act of executive decision-making.

*City of Pinellas Park v. Brown*, 604 So.2d 1222, 1227 (Fla.1992).

 Here, construing the record in a light most favorable to Plaintiffs, the Court finds issues of fact precluding sovereign immunity on Plaintiffs' wrongful-death and assault claims. There is no question that the hanger underneath Samer's shirt, along with the numerous 911 calls, generated legitimate suspicion that Samer was concealing a firearm. Police were justified in responding aggressively to the situation and identifying a potential threat to public safety. However, when viewed in a light most favorable to Plaintiffs, the record supports Plaintiffs' allegations that Samer and Husien complied with police orders, that they stopped and raised their arms within seconds of receiving the command from officers, and that their hands were empty. While the Defense maintains that Samer and Husien shuffled around and dug in their waistbands, Samer's deposition testimony indicates Husien and Samer immediately raised their arms after receiving police orders and made no furtive movements before or after. And if Husien and Samer timely complied with police orders and made no furtive movements in the course of the stop, a trier of fact could conclude that at the time Tavss discharged his firearm, no pressing emergency existed requiring the use of deadly force to protect the public. Accordingly, Tavss's use of a firearm would remain "operational" and not "discretionary," and sovereign immunity would not apply.

 The City nonetheless argues that it is entitled to summary judgment on the basis of Florida's justifiable-use-of-deadly-force statute.

Florida Statutes section 776.012 provides that "a person is justified in the use of deadly force" if "[h]e or she reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony." Fla. Stat. § 776.012(1).

"A person who uses force as permitted in s. 776.012 ... is justified in using such force and is immune from criminal prosecution and civil action for the use of such force." *Id.* § 776.032(1).

Here, however, again viewing the record in a light most favorable to Plaintiffs, the Court finds issues of fact precluding summary judgment on the City's justifiable-use-of-force defense. If Samer and Husien complied with police orders and made no furtive movements during the stop, a factfinder could conclude that Officer Tavss could not have reasonably believed that force was necessary to prevent imminent death, bodily harm, or commission of a forcible felony. Under those circumstances the justifiable-use-of-force defense would not prevail.

The City finally argues that it is entitled to immunity because Plaintiffs were intoxicated at the time of the incident and are more than fifty percent responsible for their resulting injury.

The Florida Statutes provide a defense from tort liability in cases where the plaintiff is intoxicated and, as a result of his intoxication, is more than fifty percent at fault for harm sustained:

(2) In any civil action, a plaintiff may not recover any damages for loss or injury to his or her person or property if the trier of fact finds that, at the time the plaintiff was injured:

(a) The plaintiff was under the influence of any alcoholic beverage or drug to the extent that the plaintiff's normal facul-

ties were impaired or the plaintiff had a blood or breath alcohol level of 0.08 percent or higher; and

(b) As a result of the influence of such alcoholic beverage or drug the plaintiff was more than 50 percent at fault for his or her own harm.

Fla. Stat. § 768.36.

■ The foregoing language indicates, however, that the intoxication defense contemplates apportionment of fault by the trier of fact and not the court:

The statute plainly says ... that it is the *finder of fact* who must determine whether plaintiff was *more than 50 percent at fault for his injuries.* A judge considering a motion for summary judgment is most decidedly not a "trier of fact." Indeed, in this circumstance the judge is confined to searching the record for conflicting evidence to be submitted to a jury, and only in the absence of such evidence may the judge make a ruling of law that summary judgment is proper....

When apportionment of fault between the plaintiff and a defendant under comparative negligence is a contested issue, it is the trier of fact that must do the apportioning, not the judge deciding a legal issue.... [O]nly in the rare case when there is simply no factual dispute as to apportionment of negligence, does the trial judge have the authority to make a ruling on the issue as a matter of law.

*Pearce v. Deschesne,* 932 So.2d 640, 641 (Fla.Dist.Ct.App.2006).

■ Accordingly, the Court finds that the City is not entitled to summary judgment on the basis of its intoxication defense. Although Plaintiffs admit to having consumed alcohol and being drunk on the night in question, the Court cannot say as a matter of law that, as a result of Plain-

tiffs' intoxication, they were more than fifty percent at fault for the harm sustained in this case. A trier of fact could reasonably conclude based on the circumstances alleged that Tavss was more at fault than Plaintiffs.

For all the foregoing reasons, the Court denies the City's Motion for Summary Judgment on Counts III and VIII.

### c. Battery of Husien (Count V)

The City next moves for summary judgment on Plaintiffs' battery claim, arguing that any battery claim brought on behalf of Husien is displaced by a claim for wrongful death.

"When a personal injury to the decedent results in death, no action for the personal injury shall survive, and any such action pending at the time of death shall abate." Fla. Stat. § 768.20. Accordingly, "when death is the result of a personal injury, the law of Florida essentially substitutes a statutory wrongful death action for the personal injury action...." *Niemi v. Brown & Williamson Tobacco Corp.*, 862 So.2d 31, 33 (Fla.Dist.Ct.App.2003).

The Court therefore finds, and Plaintiffs concede, that Plaintiffs cannot sustain any independent battery claim with respect to Husien.

On this basis grants the City's Motion for Summary Judgment as to Count V.

### d. Negligent Hiring and Retention of Tavss (Count VI)

The City finally moves for summary judgment on Plaintiffs' negligent-hiring-and-retention claim, arguing that is barred by sovereign immunity and/or is factually unsustainable.

To sustain a negligent-hiring claim under Florida law, a plaintiff must show: "(1) the employer was required to make an appropriate investigation of the employee and failed to do so; (2) an appro-

priate investigation would have revealed the unsuitability of the employee for the particular duty to be performed or for employment in general; and (3) it was unreasonable for the employer to hire the employee in light of the information he knew or should have known." *Malicki v. Doe*, 814 So.2d 347, 362 (Fla.2002). Negligent retention occurs when, during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicate his unfitness, and the employer fails to take further action such as investigation, discharge, or reassignment. *Garcia v. Duffy*, 492 So.2d 435, 439 (Fla.Dist.Ct.App. 1986).

A municipality cannot be held liable in a negligence action concerning the content of its hiring policies, for as discussed above, "under Florida law, a governmental entity is immune from tort liability based on actions that involve its 'discretionary functions.'" *Cook v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1117 (11th Cir.2005).

To sustain a claim against a state agency for negligent hiring, therefore, the plaintiff must present evidence that the agency, in an "operational capacity," either disregarded or negligently implemented preexisting hiring protocols. *Doe v. Miami–Dade Cnty.*, 797 F.Supp.2d 1296, 1304 (S.D.Fla.2011). This evaluation requires comparison of two sets of evidence. *Id.* The first is evidence of the municipality's actual hiring policies. *Id.* The second is evidence of how these general standards were applied to the particular hiring of the subject employee. *Id.*

In *Doe*, the plaintiff accused the defendant police officer of sexual assault and filed an action alleging, among other things, negligent hiring of the officer by the police department. *Id.* The record

revealed various alleged indiscretions by the defendant officer before his hiring, including a weapons arrest, involvement in a domestic disturbance, alleged drug use and gambling, traffic infractions, evasive responses on his employment application, and a testing of "marginal" on a psychological examination. *See id.* at 1305–06. The Court found the plaintiff's evidence insufficient to sustain a negligent-hiring claim, explaining as follows:

> Although the plaintiff argues the police department should have conducted a deeper investigation into alleged irregularities and/or discrepancies from Brosky[']s psychological evaluation and background check, even the plaintiff's expert on police hiring procedures ... fails to point out any specific instance when the department actually breached its protocol.
>
> \* \* \* \* \* \*
>
> None of [the plaintiff's expert's] observations suggest the police department negligently implemented its hiring criteria, and they do not open the sovereign-immunity door to the plaintiff's negligence claim. The plaintiff has failed to adduce evidence Brosky's hiring was anything other than by-the-book. Thus, the plaintiff cannot establish the County was negligent in its "operational capacity."
>
> Further, it bears pointing out that even in the absence of sovereign immunity, the Court does not perceive any clues from Brosky's background that he posed an unacceptable risk under any realistic hiring standard. The supposed "red flags" about Brosky's application were, at most, that he, (1) arguably provided evasive (though not false) information about smoking marijuana one time in 1983, and he may have given marginally inconsistent details about smalltime gambling in Las Vegas a decade earlier

ago; (2) received between two and four traffic tickets in the past; (3) was once arrested in Georgia for carrying a concealed weapon, but the charges were dropped; and (4) was involved in a domestic disturbance in 1991, when the police responded to shouting between him and his wife. None of these details disqualified Brosky from serving as a policeman, or put the County on notice he posed an abnormal risk. As a result, even if the hiring of Brosky were an operational function, there would be insufficient evidence for a trial on whether the County violated a duty of care to the plaintiff.

*Id.* at 1305–06 (footnoted omitted).

█ In line with the foregoing, the Court finds Plaintiffs' negligent-hiring-and-retention claim barred by sovereign immunity and/or factually unsustainable. The record reveals that when Tavss applied to work for the department, a full background investigation was conducted in accordance with standard operating procedures. The investigation included an extensive criminal and civil background check, a traffic history check, a written questionnaire, and a voice-stress analysis test. The investigation revealed Tavss's alleged domestic dispute with Rindone, the police report filed after that incident, and Rindone's application for a restraining order in Miami–Dade County. The investigation also revealed Tavss's juvenile arrest for loitering and various traffic infractions dating back to 1991. Tavss stated during an interview that police had never been sent to him home, but he was apparently referring to his home at the time of application and not at the time of the domestic dispute. Tavss maintained that he had never injured a spouse or significant other, but a voice-stress analysis supported the truthfulness of the claim. While Plaintiffs maintain that the department should have

dug deeper by interviewing Rindone and unearthing her restraining-order application in Leon County, the fact is that the department was already aware of the allegations and absence of any resulting criminal or civil adjudications. Plaintiffs fail to establish any specific manner in which the City breached its hiring protocols. As in *Doe*, the Court finds insufficient evidence that Tavss's hiring was "anything other than by-the-book" or that Tavss's history disqualified him from service as a police officer. Moreover, the Court finds the two post-hiring incidents cited by Plaintiffs insufficient to sustain a claim for negligent retention. Tavss accidently allowed a detainee to escape while working as a jailer, and he was reprimanded by the department as a result. And when Tavss was accused by another officer of having used drugs, the department subjected him to a drug test and found the accusation unsubstantiated. The Court finds these two transgressions—one of which was determined to be unfounded—insufficient to establish that the department was negligent in retaining Tavss on the force.

On this basis the Court grants the City's Motion for Summary Judgment as to Count VI.

### V. Conclusion

For the reasons stated herein, it is hereby **ORDERED AND ADJUDGED** that:

1. Defendant City of Miami Beach's Motion for Summary Judgment (D.E. 104, 7/11/12) is **GRANTED IN PART AND DENIED IN PART.**

2. **SUMMARY JUDGMENT** is **GRANTED** in favor of the City as to Counts I, V, and VI of Plaintiffs' Second Amended Complaint.

3. **SUMMARY JUDGMENT** is **DENIED** as to Counts III and VIII of Plaintiffs' Second Amended Complaint.

4. Defendant City of Miami Beach's Motion to Dismiss Plaintiffs' Complaint (D.E. 66, 3/15/12), which seeks dismissal only of Counts I and VI, is **DENIED AS MOOT.**