[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-13711

_____

D.C. Docket No. 3:13-cv-00463-HES-TEM


RMS TITANIC, INC.,
PREMIER EXHIBITIONS, INC.,

Plaintiffs-Appellants,

versus

KINGSMEN CREATIVES, LTD,
KINGSMEN EXHIBITS, PTE, LTD,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 2, 2014)

Before ED CARNES, Chief Judge, DUBINA and SILER,[*] Circuit Judges.

PER CURIAM:

_____

[*] Honorable Eugene E. Siler, United States Circuit Judge for the Sixth Circuit, sitting by designation.

The plaintiffs, RMS Titanic, Inc. and Premier Exhibitions, Inc. (collectively, Premier), put on museum-quality exhibitions of artifacts recovered from the wreck site of the Titanic.  Premier sued two Singapore corporations, Kingsmen Creatives and Kingsmen Exhibits (collectively, Kingsmen), alleging that they had used Premier's confidential information or trade secrets to stage their own competing Titanic exhibition in China.  The district court granted Kingsmen's motion to dismiss for lack of personal jurisdiction because it found that Florida's long arm statute did not provide it with personal jurisdiction over the Kingsmen entities.  This is Premier's appeal.

## I.

Premier is made up of two entities, both of which are Florida corporations with their principal place of business in Atlanta, Georgia.  As part of its business, Premier partners with venues to present exhibitions about the Titanic.  On June 13, 2011, Premier entered into an agreement with a Singapore promoter (who is not a party to this lawsuit) to produce a Titanic exhibition in Singapore.  Thomas Zaller, a former Premier employee who was working as a consultant to the Singapore promoter, helped the promoter negotiate the contract between it and Premier.  Over the course of his involvement, Zaller repeatedly demanded and was ultimately given access to what Premier describes as "confidential and proprietary information."  Before granting access to that information, however, Premier

2

required the Singapore promoter to agree to certain confidentiality provisions. The information that Premier gave Zaller and the promoter included "Computer-Aided Design files, graphic and text files, photographs and videos, floor plans, narratives, [and] designs for its signature works."

Kingsmen is composed of Kingsmen Creatives (KC) and Kingsmen Exhibits (KE), both of which are Singapore corporations with their principal place of business in Singapore. The Kingsmen entities became involved in the production of the Singapore Exhibition when the promoter hired KE to build a glass floor for one of the rooms in it. That was Kingsmen's only involvement in the Singapore Exhibition. About a year later, on August 28, 2012, Zaller's Singapore-based company, Imagine Exhibitions (Imagine), entered into a contract with Kingsmen to put on its own Titanic exhibition in Macau, China. Under the terms of the agreement between Imagine and Kingsmen, Imagine provided Kingsmen with the outline and concepts for the Macau Exhibition and Kingsmen helped to design, construct, and install it.

In preparation for the Macau Exhibition, Kingsmen contracted with a Florida company, Attractions and Entertainment Solutions (AES), to purchase a cold-to-the-touch iceberg. There is a similar iceberg in Premier's exhibitions. Kingsmen was in Singapore when it negotiated the purchase of the iceberg from AES through email and telephone conversations. In connection with that purchase, Kingsmen

3

emailed to AES in Florida photographs and documents that it had received from Zaller.  Premier maintains that what Kingsmen sent was Premier's "Design File" and that Kingsmen did so knowing the design file contained "proprietary and confidential intellectual property."  The iceberg was designed, processed, and manufactured by AES in Jacksonville, Florida, and sent to Kingsmen in Singapore. That is the only link between what Kingsmen did and Florida.  All of the other work Kingsmen did for the Macau Exhibition took place in Asia.

Premier's complaint alleges that the Zaller/Kingsmen Exhibition was a "striking copy" of Premier's exhibition and that Zaller and Kingsmen used the confidential, proprietary information Premier had given them to stage the Singapore Exhibition.  It also alleges that the iceberg Kingsmen purchased was an "absolute copy of the iceberg utilized by [Premier] in the [Singapore Exhibition] and numerous other Titanic exhibitions presented by [Premier] around the world." Premier further maintains that the iceberg is "a key component of the Zaller/Kingsmen Exhibition and was able to be built only because [Kingsmen] provided AES [with Premier's] intellectual property that had been fraudulently obtained by Zaller."  The Zaller/Kingsmen Exhibition opened in Macau, China in October 2012 and operated through March 31, 2013.

These events spawned several lawsuits.  First, on February 26, 2013, Premier filed suit in the Northern District of Georgia against Zaller and his

4

companies.  On April 16, 2013, before filing a lawsuit against Kingsmen, Premier made it a settlement offer.  Anthony Chong, KE's Managing Director, contacted Samuel Weiser, the CEO of Premier, and asked for more time to consider the offer. Weiser promised that Premier would not file a lawsuit until April 23, 2013, but it was KE that struck first.  On April 22, 2013, KE filed an action against Premier in Singaporean court seeking a declaration that it had not violated Premier's intellectual property rights.  Finally, on April 29, 2013, Premier filed the complaint in the lawsuit that led to this appeal, asserting claims for (1) conversion, (2) unjust enrichment, (3) trade dress infringement, (4) misappropriation of trade secrets, and (5) civil conspiracy.

Kingsmen filed a motion to dismiss the complaint, based on lack of personal jurisdiction, failure to state a claim, and forum non conveniens.  In support of its motion to dismiss, Kingsmen filed Chong's declaration as well as several other exhibits.  Premier opposed the motion to dismiss and supported it with the declaration of its CFO.  Premier also filed a motion for limited jurisdictional discovery and an evidentiary hearing.  The district court granted Kingsmen's motion to dismiss on August 7, 2013, reasoning that it lacked personal jurisdiction over Kingsmen under both Florida's long arm statute and the Due Process Clause. It also denied Premier's requests for limited jurisdictional discovery and an evidentiary hearing.

5

II.

We review de novo a district court's dismissal for lack of personal jurisdiction, using a two-step inquiry. Internet Solutions Corp. v. Marshall, 557 F.3d 1293, 1295 (11th Cir. 2009). We first examine whether there is jurisdiction under the state's long arm statute and then examine whether the exercise of jurisdiction over the defendant would violate due process. Id. "A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." United Techs. Corp. v. Mazer, 556 F.3d 1260, 1274 (11th Cir. 2009). Where the defendant submits contradictory affidavit evidence to challenge jurisdiction, the plaintiff must produce evidence supporting the existence of long arm jurisdiction. Id.

"Discovery matters are committed to the discretion of the district court," Lee v. Etowah Cnty. Bd. of Educ., 963 F.2d 1416, 1420 (11th Cir. 1992), so we review the district court's denial of Premier's request for jurisdictional discovery under an abuse of discretion standard, see White v. Coca-Cola Co., 542 F.3d 848, 853 (11th Cir. 2008).

III.

We first examine whether jurisdiction is proper under Florida's long arm statute. That statute provides in relevant part that a person who is not a citizen or

6

resident of Florida is subject to the state's jurisdiction for "any cause of action arising from any" one of the following acts:

> (1) Operating, conducting, engaging in, or carrying on a business or business venture in this state . . . .

> (2) Committing a tortious act within this state.

Fla. Stat. § 48.193(1)(a)(1)–(2).  Premier argues that Kingsmen "engaged in a business venture" by contracting with a Florida business to construct a mechanical iceberg based on Premier's stolen intellectual property.  It also argues that Kingsmen committed tortious acts — conversion and civil conspiracy — in the State of Florida that are sufficient to support the district court's exercise of personal jurisdiction under the long arm statute.[1]

### A.

"In order to establish that a defendant is 'carrying on business' for the purposes of [Florida's] long-arm statute, the activities of the defendant must be considered collectively and show a general course of business activity in the state for pecuniary benefit."  Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A., 421 F.3d 1162, 1167 (11th Cir. 2005) (quotation marks omitted).  That requirement can be satisfied either by (1) "'doing a series of similar acts for the purpose of

---

[1] In its initial complaint, Premier raised a third basis for the exercise of long arm jurisdiction — "[c]ausing injury to persons or property within this state arising out of an act or omission by the defendant outside this state." Fla. Stat. § 48.193(6)(a). Premier has failed to argue that basis on appeal, so it is abandoned. See United States v. Ardley, 242 F.3d 989, 990 (11th Cir. 2001) ("[I]ssues and contentions not timely raised in the briefs are deemed abandoned.").

thereby realizing pecuniary benefit or'" (2) "'doing a single act for such purpose with the intention of thereby initiating a series of such acts.'"  Wm. E. Strasser Constr. Corp. v. Linn, 97 So. 2d 458, 460 (Fla. 1957) (quoting with approval the Restatement (First) of Judgments § 22 (1942)) (emphasis omitted).

In Horizon Aggressive we listed several factors courts should consider in determining whether a defendant engaged in a "general course of business activity."  421 F.3d at 1167.  These include:  (1) "the presence and operation of an office in Florida"; (2) "the possession and maintenance of a license to do business in Florida"; (3) "the number of Florida clients served"; and (4) "the percentage of overall revenue gleaned from Florida clients."  Id. (citations omitted).  Although these factors are not dispositive, this Court and Florida courts have applied them to preclude jurisdiction before.  For example, in Horizon Aggressive, we held that there was no jurisdiction because the defendant did not have any operations in Florida, served only six Florida clients, and the revenues from those clients amounted to less than five percent of its gross revenue.  Id. at 1167.  And in Milberg Factors, Inc. v. Greenbaum, 585 So. 2d 1089, 1091 (Fla. 3d DCA 1991), a Florida district court of appeal declined to exercise jurisdiction under the business venture provision where the defendant did not maintain offices, employees, or telephone listings in Florida, did not solicit business in Florida, and its only business connections to Florida were five "isolated" factoring agreements over a

8

ten-year period with Florida-based companies that amounted to less than two percent of its total revenue.

In this case, the only contact between Florida-based AES and Singapore-based Kingsmen was the negotiation and execution of a single contract for Kingsmen's purchase of the iceberg. Kingsmen does not have any agents or employees in Florida, it does not maintain offices there, and it does not derive any revenue from business transactions in Florida. The purchase of one item, standing alone, is not sufficient to show a "general course of business activity," as required by Florida's long arm statute.[2]

Premier attempts to enlarge what is a single transaction by breaking it down into phases — the "initial solicitation," the "continued . . . negotiat[ion]," "enter[ing] into a written agreement," and tendering payment for the item.[3] The evidence, construed in the light most favorable to Premier, shows that Kingsmen spent slightly over a month contracting with AES through telephone and email for

---

[2] It is true that the agreement between Kingsmen and AES also included a one-year warranty and one year of telephone technical support, but nothing in the case law suggests that is enough to elevate the deal to a "general course of business activity." While AES's service commitments are continuing, they are ancillary relationships that stem from a single, isolated purchase.

[3] Premier also alleges that Kingsmen and AES executed their written agreement in Florida. But the affidavit evidence suggests that the entire transaction, including the execution of the contract, was done electronically. And Kingsmen asserts that none of its representatives "ever set foot in Florida." Because Premier has not presented evidence specifically refuting that contention, we cannot accept as true its allegation in the complaint that the contract was executed by Kingsmen in Florida. See Cable/Home Commc'n Corp., 902 F.2d 829, 855 (11th Cir. 1990).

the construction of the iceberg.  We have held that "telephonic and electronic communications [made from elsewhere] into Florida" do not constitute carrying on a business venture in Florida, even when those phone calls were incident to some economic activity.  Horizon Aggressive, 421 F.3d at 1167; see also Sculptchair, Inc. v. Century Arts, Ltd., 94 F.3d 623, 628 (11th Cir. 1996) (holding that making phone calls from Canada to Florida did not qualify as carrying on a business venture in Florida).  The fact that Kingsmen's isolated purchase of one item from a Florida company was accompanied by telephone and email communication does not render it a "general course of business activity . . . for pecuniary benefit."[4] Sculptchair, 94 F.3d at 628.

That is not to say that conducting a single transaction can never amount to engaging in a "business venture" within the meaning of the statute.  Florida courts have recognized that a "'business venture' can consist of a single project or

---

[4]   We also note that the fact that Kingsmen purchased the iceberg from a Florida company — as opposed to selling an item to a Florida resident — calls into question whether the transaction was for Kingsmen's "pecuniary benefit."  In Future Technology Today, Inc. v. OSF Healthcare Systems, we considered whether a nonresident corporation that paid a Florida company to service its computer information systems was "carrying on a business venture" within the meaning of the long arm statute.  218 F.3d 1247 (11th Cir. 2000).  We held that it was not, in part because "the immediate pecuniary interest to the defendant was the expenditure in excess of $800,000 paying for plaintiff's services."  Id. at 1250.  In other words, the defendant's act did not qualify as carrying on a business venture because it was not a "general course of business activity in the State for pecuniary benefit."  Sculptchair, 94 F.3d at 627 (emphasis added).  The same could be said of Kingsmen's purchase of the iceberg from AES.  While the iceberg might help Kingsmen make money in Macau and anywhere else it is exhibited, Kingsmen did not, by buying it, seek to earn any money in Florida.  Instead, it spent money there.

10

transaction." Atlantis Marina & Yacht Club, Inc. v. R&R Holdings, Inc., 766 So. 2d 1163, 1165 (Fla. 3d DCA 2000) (finding the long arm statute's "business venture" requirement satisfied where company brought a $1.45 million yacht to Florida, marketed it over a period of time, and eventually sold it in Florida). But they have generally done so only where the transaction was substantial in scope and could lead to additional economic activity in the state. See, e.g., Linn, 97 So. 2d at 460 (entering into a contract to construct an apartment building in Florida, with the intent of renting that building to tenants, was a "business venture" sufficient to support long arm jurisdiction); State ex rel. Weber v. Register, 67 So. 2d 619, 620–21 (Fla. 1953) (purchasing Florida orange grove and later listing it for sale in Florida was a business venture sufficient to obtain substituted personal service and establish jurisdiction); Labbee v. Harrington¸ 913 So. 2d 679, 683 (Fla. 3d DCA 2005) (finding the "business venture" requirement satisfied where the defendant rented out property for 20 years and then sold it). Florida courts have declined to exercise long arm jurisdiction where the transaction in question was isolated and did not involve any continued activity. See Foster, Pepper & Riviera v. Hansard, 611 So. 2d 581, 582–83 (Fla. 1st DCA 1992) (law firm's preparation of a private placement memorandum to facilitate a limited partnership offering was not a general course of business activity sufficient to invoke long arm jurisdiction); Hayes v. Greenwald, 149 So. 2d 586, 587 (Fla. 3d DCA 1963) (holding that "[t]he

11

isolated action of selling a home, by one who moves to another state, does not amount to a business venture" for purposes of the substituted services statute and therefore jurisdiction was lacking).

Kingsmen's conduct in this case was isolated and did not involve continuous commercial activity. It does not fall into the same category as the decisions where a single transaction was held to establish long arm jurisdiction. Those cases dealt with defendants who were attempting to generate money in the State of Florida while simultaneously resisting the state's jurisdiction over their activities. See Atlantis Marina, 766 So. 2d at 1165; Linn, 97 So. 2d at 460; Weber, 67 So. 2d at 620–21; Labbee, 913 So. 2d at 683. By contrast, Kingsmen does not make any money in Florida. The economic activity on the part of the defendants in those cases was also more extensive and more connected to the State of Florida than Kingsmen's activities here. For example, in Linn, the defendant executed a contract for the construction of an apartment building which it planned to rent out to generate revenue. 97 So. 2d at 460. And in Atlantis Marina, upon which Premier relies, the defendant brought an expensive yacht to Florida, listed it with a Florida broker, placed it in a Florida boat show, docked it in Florida, showed it to prospective buyers on three separate occasions, and ultimately executed the sales contract and closing in Florida. 766 So. 2d at 1164–65. Kingsmen's conduct in this case — sending specifications and negotiating by email and telephone — does

not create those kind of significant contacts with Florida.  For these reasons, jurisdiction does not exist under the Florida long arm statute's doing business provision.[5]

## B.

The long arm statute also provides jurisdiction over any cause of action that "aris[es] from" the commission of a tort in Florida.  Fla. Stat. § 48.193(1)(a)(2).  A person can commit a tort under § 48.193 by making "telephonic, electronic, or written communications into Florida," but for jurisdiction to exist, "the cause of action must arise from the communications."  Wendt v. Horowitz, 822 So. 2d 1252, 1260 (Fla. 2002).  Premier bases its jurisdictional claim on two alleged torts: conversion and civil conspiracy.

## 1.

Under Florida law, the tort of conversion is defined as "an act of dominion wrongfully asserted over another's property inconsistent with his ownership therein."  United Techs. Corp., 556 F.3d at 1270 (quotation marks omitted).  "[T]o state a claim for conversion, one must allege facts sufficient to show ownership of the subject property and facts that the other party wrongfully asserted dominion over that property."  Edwards v. Landsman, 51 So. 3d 1208, 1213 (Fla. 4th DCA

---

[5] Linn, Weber, Labbee, and Hayes all address the existence of a "business venture" in the context of a closely related jurisdictional statute, Fla. Stat. § 48.181, which provides for substituted service of process (on the Florida Secretary of State) for nonresidents engaging in business in the state.  The language of that statute and the one in this case are identical in all material respects, so the decisions construing that statute's requirements are relevant here.

2011). In this case the only conceivable conversion that occurred in Florida stemmed from Kingsmen's transmitting to AES the information necessary to build a replica of Premier's mechanical iceberg.[6] Assuming that the communication of that information amounted to conversion, Premier must still show that its "cause of action . . . ar[o]se from the communication[]." Wendt, 822 So. 2d at 1260. That requirement is known as "connexity" and it comes from the language of the long arm statute. See Fla. Stat. § 48.193 (providing jurisdiction for "any cause of action arising from" the enumerated acts). The problem the connexity requirement poses for Premier's jurisdictional bid lies in the fact that Premier's conversion claim, as it is framed in the complaint, encompasses much more than the iceberg replica. The claim is based on Zaller and Kingsmen's entire copycat exhibition, and most of the tortious activities it alleges occurred in Singapore, not Florida.

Where the alleged tort is based on an out-of-state defendant's communications into Florida, there must be some connexity "between the out-of-state communications and the cause of action such that the cause of action 'would depend upon proof of either the existence or the content of any of the communications . . . into Florida.'" Horizon Aggressive, 421 F.3d at 1168 (quoting Carlyle v. Palm Beach Polo Holdings, Inc., 842 So. 2d 1013, 1017 (Fla.

---

[6] Viewed in the light most favorable to Premier, the record shows that Premier provided Zaller and the promoter with access to its confidential information and intellectual property and that Zaller sent that information to Kingsmen. Kingsmen then transmitted to AES in Florida a copy of Premier's "design file," which contained proprietary and confidential intellectual property about how to construct the iceberg.

14

4th DCA 2003)); see also Williams Electric Co. v. Honeywell, Inc., 854 F.2d 389, 394 (11th Cir. 1988) ("For personal jurisdiction to attach under the 'tortious activity' provision of the Florida long-arm statute, the plaintiff must demonstrate that the non-resident defendant 'committed a substantial aspect of the alleged tort in Florida.'") (quoting Watts v. Haun, 393 So. 2d 54, 56 (Fla. 2d DCA 1981)).  In other words, "the activities in Florida [must be] essential to the success of the tort." Williams Electric, 854 F.2d at 394 (quotation marks omitted).

Close examination of Premier's complaint reveals that the conversion for which Premier seeks damages goes well beyond the single act of sending to AES the design for an iceberg.  For example, in its complaint Premier alleges that the "Zaller/Kingsmen Exhibition is a striking copy of the [Premier] Exhibition," and that, "[i]n laying out their exhibition, [Kingsmen] cut and pasted most of the [Premier] Exhibition floor plan into their own."  The complaint specifically states that the intellectual property Zaller and Kingsmen "wrongfully adopted, used and converted" included the Premier Exhibition's:

> unique floor plan and layout, artifact arrangements, lighting placement, customer interactive experiences (including the passenger tickets provided to each customer upon entering the exhibition, and the cold to the touch iceberg exhibit), print text narrative contents and locations, room re-creations (including . . . each room's details [such as] architecture, color scheme, placement, and decoration, photograph opportunities, etc.), photograph content and locations, and much more.

15

As Premier describes it, Zaller and Kingsmen copied a great deal of the Premier Exhibition's material, "including but not limited to design elements, room re-creations, signature works, photographs, and narratives, in order to create and operate a competing exhibition." There is little doubt that those allegations state a claim for conversion, but the vast majority of the alleged conduct occurred in Singapore. The allegations of the complaint establish that Premier's cause of action for conversion arises not so much from Kingsmen's dealings with AES to produce a copy of the iceberg as from its efforts to recreate the entire exhibition, of which the iceberg is just one part.

Although the complaint alleges that the "iceberg, and the room in which the iceberg is housed in [Premier's] Titanic exhibitions, constitute signature works" of the exhibition, the iceberg is not the focus of Premier's conversion claim. Premier asserts that Kingsmen sought to duplicate not only the iceberg but also "virtually every other key component" of the exhibition for its own use. And the complaint parenthetically lists the iceberg as just one example of the larger group of "customer interactive experiences" that were allegedly copied. In light of the breadth of Premier's conversion claim, it does not "depend upon proof of either the existence or the content of any of the communications . . . into Florida," Horizon Aggressive, 421 F.3d at 1168 (alteration in original) (quotation marks omitted),

16

and the transmittal of the iceberg information is not a "substantial aspect" of the entire tort alleged, Williams Electric, 854 F.2d at 394.

When construing the connexity requirement, Florida courts have upheld jurisdiction only where the communications themselves constituted the tort for which the plaintiff sought recovery. Thus, Florida courts have found jurisdiction where the communications at issue were alleged to be defamatory, see Achievers Unlimited, Inc. v. Nutri Herb, Inc., 710 So. 2d 716 (Fla. 4th DCA 1998), fraudulent, see Deloitte & Touche v. Gencor Indus., Inc., 929 So. 2d 678 (Fla. 5th DCA 2006), or where they amounted to negligent legal advice, see Wendt, 822 So. 2d at 1258–60 (holding that sending negligent legal work into Florida could give rise to personal jurisdiction but declining to decide whether it did in that case). That is not the situation here. Premier claims, rightly or wrongly, that Kingsmen and Zaller copied nearly every facet of its operation, but does not claim that occurred in Florida. Premier's entire claim of conversion did not "arise from the communications" about the iceberg that Kingsmen sent to AES. Wendt, 822 So. 2d at 1260.

It may be true, as counsel for Premier contended at oral argument, that there were multiple instances of conversion, and that one such instance — the conversion of propriety information about the iceberg — took place in Florida. That one conversion is not, however, the tort that Premier alleged in its complaint.

17

Premier could have drawn its complaint to limit the conversion claim to the iceberg and communications concerning it. Instead, it alleged a conversion claim centered on events that occurred almost entirely in Asia and sought to bring the whole claim into the courts of the United States based on the only link the claim has to Florida.

This Court's precedent dictates that personal jurisdiction over one individual claim cannot be expanded to cover other related claims unless the claims "arose from the same jurisdiction generating event." Cronin v. Wash. Nat'l Ins. Co., 980 F.2d 663, 671 (11th Cir. 1993). The jurisdiction generating event here was Kingsmen's transmittal to AES of the confidential iceberg information. But that act did not give rise to the many other ways in which Premier alleged that Kingsmen and Zaller committed the act of conversion. It did not, for example, give rise to the Zaller/Kingsmen Exhibition's display and use of Premier's "room re-creations, photographs, narratives, poster boards and writings." To the extent we would have jurisdiction over the claim that Kingsmen converted the iceberg design, that jurisdiction cannot be stretched to cover the full extent of the conversion Premier has alleged.

For these reasons, we agree with the district court that the "ice-berg purchase and the communication between Defendants and AES [were] merely incidental to

Plaintiffs' claims." The transmittal of the information about the iceberg is not the primary act on which Premier bases its conversion cause of action.[7]

2.

Premier also attempts to establish jurisdiction under the long arm statute's tortious activity prong by arguing that "at least one act in furtherance of a civil conspiracy" — Kingsmen's transmittal of misappropriated information to AES to build the iceberg — took place in Florida. This argument fails because Premier has not carried its burden of showing that personal jurisdiction over Kingsmen is proper on the basis of the purported civil conspiracy. See Murphy v. St. Paul Fire & Marine Ins. Co., 314 F.2d 30, 31 (5th Cir. 1963) ("It is elementary that the burden is on the appellants to show error.");[8] cf. Sculptchair, 94 F.3d at 627 ("Under Florida law, the plaintiff bears the burden of proving personal jurisdiction . . . ."). To establish a claim of civil conspiracy, a plaintiff must show (1) an agreement between two or more parties, (2) to do an unlawful act, (3) an overt act in furtherance of the conspiracy, and (4) damage to the plaintiff as a result of the act performed in furtherance of it. Walters v. Blankenship, 931 So. 2d 137, 140 (Fla. 5th DCA 2006). But in its brief to this Court Premier asserts only that

---

[7] As additional evidence that the iceberg was merely incidental to Premier's conversion claim, Kingsmen points out that the complaint Premier filed in its Georgia lawsuit against Zaller and his companies does not even mention Kingsmen and makes only passing references to the iceberg.

[8] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

"[a]ppellees committed in Florida an act in furtherance of their conspiracy to misuse the converted property" by "transferring misappropriated property into Florida for use in creating their competing exhibition."  It is not even clear from Premier's brief who the other party to the conspiracy is supposed to be.  Premier's cursory assertions in its brief to this Court may not amount to abandonment of the claim, see Singh v. U.S. Att'y Gen., 561 F.3d 1275, 1278 (11th Cir. 2009), but they are not enough to convince this Court that a conspiracy existed, much less that the district court erred in dismissing the claim for lack of personal jurisdiction.

Even if Premier had established the existence of a conspiracy, it would not satisfy the long arm statute's tortious activity provision because the conspiracy did not arise from Kingsmen's communications to AES in Florida.  AES is a non-party against whom Premier has made no allegation of wrongdoing.  And the decision on which Premier relies for the proposition that a conspirator committing an overt act in Florida is sufficient to invoke personal jurisdiction is an unpublished district court decision that involved a defendant outside of Florida who committed tortious acts against a Florida-based plaintiff that resulted in an injury in Florida.  See Energy Source, Inc. v. Gleeko Properties, LLC, No. 1:10–civ–21162, 2011 WL 3236047 (S.D. Fla. July 28, 2011); see also Machtinger v. Inertial Airline Servs., Inc., 937 So. 2d 730, 734–35 (Fla. 3d DCA 2006) (upholding jurisdiction over a nonresident defendant and his coconspirators on the basis of that defendant's

20

"fraudulent misrepresentations made from outside Florida" but sent to the plaintiff's Florida headquarters because the plaintiff's "cause of action for fraud ar[o]se out of [the defendant's] fraudulent misrepresentations that he directed into Florida"); Execu-Tech Business Systems, Inc. v. New Oji Paper Co. Ltd., 752 So. 2d 582, 585 (Fla. 2000) (finding jurisdiction over New Oji and other paper companies who conspired to fix the price of thermal fax paper in Florida and throughout the United States because, by price-fixing in Florida, the conspirators committed a tortious act on Floridian soil).  In each of the cited cases, the defendant committed a tort in Florida against a Florida resident, and the tort committed in Florida was also the principal object of the conspiracy.  That is not the situation here.

In this case, the only alleged tortious act in Florida was the communication of information between a conspirator in Singapore and someone in Florida who is not alleged to be a conspirator.  Not only that, but the complaint alleges that the civil conspiracy encompassed Zaller and Kingsmen's plan to "misappropriate, reproduce, and convert [Premier's] intellectual property" and then to use that property to "design, create, stage, and market [their] [e]xhibition, all to [Premier's] detriment."  The allegations do not establish that the civil conspiracy cause of action "arise[s] from the communications," Wendt, 822 So. 2d at 1260, that Kingsmen sent to AES because those communications were not "essential to the

21

success of the tort," Williams Elec. Co., 854 F.2d at 394 (quotation marks omitted). Like the conversion claim, the conspiracy cause of action does not "depend upon proof of either the existence or the content of any of the communications . . . into Florida." Horizon Aggressive, 421 F.3d at 1168 (quotation marks omitted).

Because we conclude that there is no jurisdiction under Florida's long arm statute, we need not analyze whether the exercise of jurisdiction would comport with due process. See Internet Solutions, 557 F.3d at 1295. To quote the district court's aptly stated conclusion, Premier's lawsuit "cannot complete its maiden voyage because it is unable to successfully navigate the treacherous ice field of personal jurisdiction."

IV.

Having concluded that the district court properly found that it did not have jurisdiction, we now turn to Premier's argument that it was entitled to limited jurisdictional discovery before the district court dismissed the case. Federal courts clearly have the power to order jurisdictional discovery, and we have held that the exercise of that power "is not entirely discretionary." Eaton v. Dorchester Dev., Inc., 692 F.2d 727, 729 (11th Cir. 1982). Our case law suggests that federal courts should order limited jurisdictional discovery where the information the plaintiff seeks, if it exists, would give rise to jurisdiction. As we explained in Chudasama

22

v. Mazda Motor Corp., "[r]esolution of a pretrial motion that turns on findings of fact — for example, a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) — may require some limited discovery before a meaningful ruling can be made."  123 F.3d 1353, 1367 (11th Cir. 1997).  Compare Eaton, 692 F.2d at 730–31 (reversing the district court's dismissal for lack of jurisdiction where, among other things, the information the plaintiff sought could have given rise to jurisdiction) with Posner v. Essex Ins. Co., 178 F.3d 1209, 1214 n.7 (11th Cir. 1999) (affirming the district court's dismissal of the case without jurisdictional discovery where the plaintiffs failed to specify what they sought to discover).  The resolution of the jurisdictional question in this case does not require any additional findings of fact.

While Premier did identify certain areas in which it wanted more discovery — namely, the dealings between AES and Kingsmen — it had already received information from AES, and Kingsmen itself admitted that it had given AES the specifications it received from Zaller in connection with the iceberg transaction.  More importantly, there is no indication that the receipt of additional information about this one transaction would demonstrate the existence of jurisdiction.  As for long arm jurisdiction under the "business venture" provision of § 48.193, additional details about the phone calls and emails between AES and Kingsmen would not undermine the conclusion that the purchase of one item from AES does

not amount to a "general course of business activity in the state for pecuniary benefit." Horizon Aggressive, 421 F.3d at 1167 (quotation marks omitted). As for jurisdiction under the "tortious conduct" provision, even the most incriminating evidence about Kingsmen's dealings with AES would not make Premier's cause of action arise from that conversion, for the reasons already explained.

Because the facts Premier sought would not have affected the district court's jurisdiction, it was not an abuse of discretion for the district court to deny the motion for jurisdictional discovery. See Chudasama, 123 F.3d at 1367–68 (discussing the burdens that unnecessary discovery imposes on the parties and the judiciary and concluding, in the context of a 12(b)(6) motion, that the district court abused its discretion by allowing discovery where discovery was not necessary to decide the motion). Although a motion to dismiss for lack of personal jurisdiction may in some cases require limited jurisdictional discovery, that is only true if the resolution of that motion "turns on findings of fact." Id. at 1367. Because this one does not, it was not an abuse of discretion for the district court to deny Premier's motion for jurisdictional discovery.

## V.

The judgment of the district court is **AFFIRMED.**